# Exhibit 2

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL:  (212) 541-7212   FAX:  (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 1 of 51

**EMPLOYER**:   The Roosevelt Hotel New York

HTC Case #U20-260/ Emergency hearing requested by the New York Hotel and Motel Trades Council, AFL-CIO ("Union") against the Roosevelt Hotel ("Employer") regarding the Employer's violation of the IWA and the law by, inter alia, their failure to provide WARN notice to Employees; and failure to provide requested information.

AMENDED CAPTION: Emergency hearing requested by the New York Hotel and Motel Trades Council, AFL-CIO ("Union") against the Roosevelt Hotel ("Employer") regarding the Employer's violation of the IWA and the law by, inter alia, their failure to provide WARN notice to Employees; failure to provide requested information; regarding the Employer's willful violation of IWA Article 52(B); and, regarding the Employer's failure to comply with Article 8(A)(ii) of the March 2020 Coronavirus Safety Protocol Agreement.

Hearings held on June 10, July 7 and July 8, 2021.

**A P P E A R A N C E S :**

| | |
|---|---|
| For the Employer: | Cynthia Ramnarinne<br>Assistant Director of Human Resources |
| Counsel for the Employer:<br>By: | VENABLE LLP<br>Michael Volpe, Esq. |
| For the New York Hotel & Motel Trades Council, AFL-CIO:<br>Counsel:<br>By: | Pitta LLP<br>Joseph Farelli, Esq. |
| For the Union: | William St. Pierre, HTC |

*     *     *

The New York Hotel and Motel Trades Council, AFL-CIO ("Union") and the Roosevelt Hotel ("Hotel" or "Employer") are parties to a collective bargaining agreement known as the Industry-wide Agreement ("IWA". The Union initiated arbitration alleging that the Hotel failed and refused to comply with the Union's multiple requests for information (collectively, "RFIs"). It seeks an award imposing a penalty against the Employer for such failure. It is beyond question that the Hotel closed on or about December 31, 2020, and as a consequence the Union repeatedly requested information from the Hotel regarding the closing and especially what the owner of the Hotel was contemplating as potential uses of the property thereafter. It is equally

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 2 of 51

clear that, being the exclusive bargaining agent of the employees of the Hotel, its RFIs were in furtherance of that role and were indispensable to prepare for, among other things, effects bargaining, and, of course, to continue to administer, as was its right and obligation, the terms of the IWA. The Union's evidence and arguments centered around its belief that while the Hotel's managing agent initially provided information partially responsive to the Union's first RFI, the owner of the Hotel failed and refused to provide a shred of documentary information responsive to the Union's subpoenas and subsequent RFIs.

During the hearing, much ado was made by the Union that the testimony of the Hotel's principals revealed the Employer was in possession of certain documents that were more than arguably responsive to the RFIs but had not been turned over to the Union and, the Union's brief admonishes that such documents, even at the time of the submission of the brief, had still not been turned over to the Union. The Union highlights the fact that this tribunal's broad powers, under the IWA and precedents, include the awarding of penalties against hotel-employers who fail and refuse to provide requested information to the Union in furtherance of its collective bargaining representative duties. The Union emphasizes that arbitrators have the right to draw and have drawn adverse factual inferences against a party who refuses to produce evidence relevant to the determination of issues before the arbitrator. It avers that this is what I should do here because by its conduct the Hotel must be seen as hiding information form the Union regarding post-closure use of the property in order to avoid the Union enforcing Article 57 of the IWA, which, among other things, requires the Hotel to pay additional severance pay to Hotel employees laid off as a result of a conversion of a hotel, in whole or part, to residential use. Finally, and consequently, the Union seeks an award finding that the Hotel violated its obligations under the IWA and the National Labor Relations ("Act") by failing and refusing to provide the Union with the information requested in the RFIs. As a remedy, the Union asks that I direct the Hotel to pay each of its laid off employees an amount equal to the severance pay provided for in Article 57 of the IWA and, further that I retain jurisdiction to determine what additional remedies and/or penalties should be awarded based upon the Hotel's blatant refusal to provide documents in its possession responsive to the RFIs.

The Hotel takes a totally different view of this case.  Its thesis is that the underlying grievances make ambiguous and unwarranted claims following the anticipated permanent closure of the Hotel. At various times throughout this proceedings, the Employer pointed out that the IWA had been entered into between the Union and Aimbridge Hospitality, the Manager of the Hotel engaged by the owner of the Hotel. The Chairperson pauses to note that Interstate Hotels LLC merged with Aimbridge Hospitality in 2019. The Employer contends that the only ostensible issue in this case, which cannot rise to the level of a grievance, is what the plans are for the future of the Hotel, which it further maintains has been asked and answered repeatedly since the closure announcement in October 2020.  That answer is: "We don't know."  The Employer emphasizes that the Union's refusal to believe that answer does not give it the right to grieve, arbitrate and seek relief. In short, there is no contractual basis to attack the Hotel's answer. The Employer urges that its answer be put in context, namely that the pandemic caused it, and many other owners of hotels in New York City, to close for pure economic reasons, causing the layoffs announced by the Hotel Manager, followed by payment of Article 52 severance pay to those laid off employees. The Hotel permanently closed its doors to the public on December 18, 2020 retaining a skeleton crew of some ten bargaining unit employees in order to preserve the property.

The Hotel charges the Union with an attempt to go beyond its bargained for rights, adding despite the absence of any specific allegations of a violation of the IWA or the law, by seeking additional severance pay from the Owner for failing to make a decision regarding the future of the hotel while the owner is still coping with the impact of the Coronavirus pandemic. In sum, the Employer seeks an award dismissing the grievance in its entirety.

As reflected in the Contentions section below, each side submitted post-hearing briefs setting forth in great detail not only their arguments, but also a comprehensive statement of facts. By and large, their critical relevant factual accounts are not appreciably disparate. That being said, and following the notion of arbitral economy, the undersigned need not devote time narrating evidence from his notes. Rather, in the Analysis section below, he will, as necessary, address and resolve any important discrepancies in their factual declarations.

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY  10036**
**TEL:  (212) 541-7212   FAX:  (646) 992-8103**

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 4 of 51

## CONTENTIONS[1]

## THE UNION'S CONTENTIONS

### PRELIMINARY STATEMENT

The New York Hotel and Motel Trades Council, AFL-CIO ("Union"), submits this post-hearing brief in response to the Roosevelt Hotel's ("Hotel") failure and refusal to comply with the Union's multiple requests for information (collectively "RFIs") and in support of its application to the Impartial Chairperson for an order penalizing the Hotel for such failure. The undisputed evidence in this case shows that the Union repeatedly requested information from the Hotel regarding the closure of the Hotel, effective December 31, 2020, and potential uses of the Hotel thereafter. The Union's requests were in furtherance of its role as exclusive collective bargaining representative to prepare for impact a/k/a effects bargaining on behalf of bargaining unit employees, as well to administer the terms of the parties' collective bargaining agreement. Yet, the same evidence shows that while the Hotel's managing agent initially provided information partially responsive to the Union's initial request for information, the Hotel owner failed and refused to provide a shred of documentary information responsive to the Union's subpoenas and subsequent RFIs. Most shockingly, the testimony of the Hotel's principals established that it was in possession of documents that were indisputably responsive to the RFIs but were inexplicably not turned over to the Union. Additionally, notwithstanding Hotel counsel's representation at the more recent hearings in this matter that such documents would be produced, no such production has taken place to date.

It is well established that the Office of the Impartial Chairperson's broad arbitral powers include the awarding of penalties against hotel-employers who fail and refuse to provide requested information to the Union in furtherance of its collective bargaining representative duties. Moreover, inherent in an arbitrator's grant of power is the authority to draw adverse factual inferences against parties who refuse to produce evidence relevant to the determination of factual issues pending before the arbitrator.

Accordingly, the Union requests that the Impartial Chairperson find that the Hotel violated its obligations under the IWA and the National Labor Relations ("Act") by failing and refusing to provide the Union with the information requested in the RFIs. The Union further requests an award from the Impartial Chairperson which draws an adverse inference that the Hotel is hiding information from the Union regarding its post-closure use of the Hotel in order to avoid the Union enforcing IWA Article 57 which requires the Hotel to pay additional severance pay to Hotel employees laid off as a result of a conversion of the Hotel, in whole or part, to residential use.

---

[1] The statement of the parties' contentions is drawn, nearly *verbatim*, from their post-hearing submissions and is set forth here in different line spacing, font size and style to differentiate their words from the Arbitrator's. To avoid confusion, their footnotes appear within editor's brackets at the point in their brief where the footnote marked originally appeared.

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 5 of 51

As such, the Impartial Chairperson should direct the Hotel to pay each Hotel employee an amount equal to the severance pay provided for in Article 57 of the IWA. The Impartial Chairperson should also retain jurisdiction to determine what additional remedies and/or penalties to award based upon the Hotel's blatant refusal to provide documents in its possession responsive to the RFIs.

### UNDISPUTED FACTS

**Hotel Bound to the IWA**

The Hotel is bound to the Industry-Wide Agreement between the Union and the Hotel Association of New York City, Inc. ("Association") known as the "IWA."

**Relevant Contractual Provisions**

Article 26 of the IWA provides, in part:
All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairman, and his/her decision shall be final and binding upon the parties hereto. Any questions regarding arbitrability, substantive, procedural, or otherwise, or regarding the Impartial Chairperson's jurisdiction or authority, shall be submitted to the Impartial Chairperson in accordance with this Article. [emphasis added]

Article 57 of the IWA provides in part:
(A) If, during the term of this Agreement, a signatory Hotel is converted to residential use (e.g., a condominium or co-operative use of the building, apartment rental units, etc.) the EMPLOYER shall pay to the affected employees, i.e., those who suffer a permanent loss of employment due to such conversion, severance under the following terms: fifteen (15) days for each year of service calculated and paid under the procedures of Article 52(B). The benefit funds shall receive a payment, calculated in accordance with Article 52(B), for each affected employee.

Article 59 of the IWA provides in part:
(B) EMPLOYER shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel or Concessionaire such that the party ("transferee") assuming such majority ownership, management or operational control must assume and be bound in writing to this Agreement. [emphasis added]

(C) A successor, assign or transferee shall assume all obligations of the predecessor, assignor or transferor,

including this Agreement and those agreements and practices supplementing this Agreement. Subject to Paragraph (D), every successor, assign and transferee shall execute an assumption agreement substantially similar to the following not less than ten (10) business days prior to any transfer or change covered by this Article.

**Closure of Hotel and Multiple Union RFIs**

Hotel counsel sent a letter to the Union dated October 4, 2020 (Union Exhibit A) advising:

As you know, we are counsel to <u>RHC Operating, LLC (a/k/a "PIA Investments Ltd") the owner of the Roosevelt Hotel.</u> On behalf of Dr. Nanjeeb Samie, we thank you for your time last week to discuss the dire situation at the Hotel. <u>As Dr. Samie informed,</u> the economic losses are not sustainable and due to the overall situation, <u>the Hotel will permanently close.</u> [emphasis added]

Such letter also included an unsolicited comment from the Hotel that IWA Article 57 had not yet been triggered.

The Hotel later publicly announced that it would close permanently on October 31, 2021. Additionally, contemporaneous news reports indicated that the Hotel would be renovated and converted for residential and commercial use (See Union Exhibits T-V). As such, Union General Counsel Amy Bokerman issued a Subpoena Duce Tecum dated October 9, 2020 ("Oct. 9th Subpoena")(Union Exhibit B) requesting, <u>inter</u> <u>alia</u>, information related to the closing of the Hotel and communications related thereto, as well as information (i.e., documents or communications) regarding potential uses of the Hotel post-closure and a potential sale or transfer of the Hotel. While the Hotel's Managing Agent Aimbridge Hospitality ("Aimbridge" or "Manager") produced documents, including e-mails between Aimbridge employee Ed Netzhammer and Faisal from PIA Investments Ltd ("PIA") regarding the closing of the Hotel, neither it nor the Hotel's owner RHC/PIA ("Owner" or "Hotel") produced any documents responsive to the Oct. 9th Subpoena's information request regarding the potential use or sale or transfer of the Hotel post-closing. As such, the Union filed the instant arbitration (U#20-260) alleging a number of claims against the Hotel, including the failure to provide information.

On October 14, 2020, Impartial Chairperson held a hearing regarding the Union's claims, including the Hotel's failure to provide requested information. While Aimbridge asserted it had no further information response to the Oct. 9th Subpoena, Hotel owner counsel (hereinafter referred to as "Hotel counsel") claimed he was not yet authorized to accept service of the Oct. 9th Subpoena, but that he would obtain authorization to do so. Additionally, the Impartial Chairperson granted counsel's request that the deadline for the Hotel to comply with the Oct. 9th Subpoena was extended to October 30, 2020.  The Impartial Chairperson memorialized his findings and orders in an award issued on October 20, 2020, IC Award #2020-40 in which he retained jurisdiction should the Hotel fail to comply with his order. On

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 7 of 51

October 30, 2020, Union General Counsel Amy Bokerman issued and served another Subpoena Duce Tecum ("Oct. 30th Subpoena)(Union Exhibit C) requesting information, inter alia, "The name, title, address, phone number and e-mail address of the individual or individuals who have decision making authority regarding the future use of the Roosevelt Hotel."

Hotel counsel responded to the Oct. 9th and Oct. 30th Subpoenas (collectively "Subpoenas") via separate letters dated October 30, 2020 (Union Exhibits D and E) in which it objected to the Union's requests for information since there was no current dispute between the parties concerning an IWA violation and did not provide any information responsive to the Subpoenas. Union counsel sent a follow-up letter dated November 1, 2020 (Union Exhibit F) advising that the Hotel was non-compliant with the Subpoenas and that the requested information was necessary not only for the Union to engage in impact bargaining regarding the potential uses of the Hotel, but to determine if any provisions of the IWA, including but not limited to Article 57, were or would be applicable to the Hotel's potential future uses. The Impartial Chairperson held another hearing on November 5, 2020 and, again, directed the Hotel to fully comply with the Subpoenas. The Hotel still failed to comply with the subpoenas which prompted Union counsel's letter dated November 11, 2020 (Union Exhibit G) demanding immediate compliance with the Subpoenas.

Hotel counsel responded on November 12, 2020 (Union Exhibit H) claiming that the Hotel had no documents or communications responsive to the information requests set forth in the Subpoenas.  Union counsel replied on November 12, 2020 (Union Exhibit I), rejecting such claim, demanding full compliance with the Subpoenas and requesting the name of the person who conducted the document search in response to the Subpoenas. Union counsel's November 12th letter also reminded Hotel that its obligation to provide the information requested by the Union was ongoing and continuous. Id. Hotel Counsel, again, produced no documents responsive to the Subpoenas and, instead, only provided the name of Faisal Abdul Ghaffar who conducted the document search in response to the Subpoenas (See Union Exhibit J).  Hotel counsel also advised the Union in writing on November 19, 2020 that it had no "current plans" for alternate uses of the Hotel or sale or transfer of the same. Id.

On November 23, 2020, Union counsel requested that the Hotel provide copies of the minutes of the RHC's Board of Directors meeting held on September 17, 2020 as referenced in the previous documents turned over by Aimbridge ("Nov. 23rd RFI")(See Union Exhibit K). Again, the Hotel did not produce this requested information.

In January 2021, amid news reports concerning court judgments in the British Virgin Islands in which a receiver was appointed to supposedly oversee the assets of Pakistan, including the Hotel, Union General Counsel Bokerman sent a letter dated January 28, 2021 (Jan. 28th RFI") (Union Exhibit L) reminding the Hotel of its obligations under Article 59 of the IWA and requesting, inter alia:

1. Copies of any and all documents showing the name and contact information of each entity which has an ownership, membership, or control interest in the Hotel and a description of such interest.

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 8 of 51

2. Transcript of the Pakistan Senate meeting from January 26, 2021 where the Minister for Aviation Division, Ghulam Sarwar Khan updated the Senate on the status of the Hotel.

3. The name, title, address, phone number, and e-mail address of the individual or individuals who have decision making authority regarding the future use of the Hotel.

4. A detailed description of the potential uses to which the Hotel may be put, including any and all documents and communications, both internal and external, regarding any alternate uses for the Hotel within the past six (6) months.

5. Any and all documents and;/or communications, both internal and external, regarding a potential sale or transfer of the Roosevelt Hotel within the past six (6) months. [emphasis added]

The Hotel counsel did not produce one document responsive to this RFI. Instead, it merely represented in writing on February 9, 2021 (Union Exhibit M) that:

1. RHC Operating LLC owns the Hotel; Roosevelt Hotel Cooperation N.V. is an intermediary holding company and the sole member of RHC Operating LLC; Roosevelt Hotel Cooperation N.V. is a subsidiary of PIA Investment Ltd and PIA Investment Ltd is a subsidiary of Pakistan International Airways Corporation Limited.

2. Hotel only advises that Board of RHC has decision making authority.

On March 22, 2021, Union counsel sent a letter to the Hotel ("March 22nd RFI") (Union Exhibit N) requesting:

1. Any and all information and/or documents relating to any plans or discussions regarding potential re-opening of the Hotel as a transient or semi-transient hotel.

2. Any and all information and/or documents relating to any plans or discussions relating to any alternate uses of the Hotel.

3. Any and all information and/or documents relating to any plans or discussions relating to any sale or transfer or change in control of the Hotel. [emphasis added]

On March 30, 2021, Union counsel sent another letter to the Hotel (March 30th RFI")(Union Exhibit O) requesting information in furtherance of investigating the related and affiliated entities who have direct or indirect ownership or control of the Hotel, as well as potential claims under Article 59 and/or 65 of the IWA. The Union specifically requested:

1. Any and all information and/or documents relating to the filing of any proceeding in any jurisdiction to appoint a receiver or any

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 9 of 51

entity or person to exercise control, directly or indirectly, over the operations or finances of the Hotel.

2. Any and all information and/or documents, including but not limited to court filings or orders or attachment orders, mortgage or mortgage agreements or subordination non-disturbance attornment agreements relating to any potential transfer, directly or indirectly, of ownership, possession or control of the Hotel.

3. Any and all documents, including but not limited to unredacted all operating agreements, articles of incorporation, partnership agreements, identifying any individuals or entities having a direct or indirect ownership, management or controlling interest in RHC Operating LLC.

4. Any and all documents showing the top ten members of RHC Operating LLC based upon a percentage of ownership interests and to the extent the members are entities, then their top ten individual members of such limited liability corporations. [emphasis added]

The Hotel did not produce any documents responsive to the March 22nd RFI or the March 30th RFI, even after Union Counsel sent follow-up letters on April 13, and 16, 2021 (Union Exhibits Q and S) demanding full compliance with the Subpoenas and all pending Union RFIs. Instead, the Hotel objected in writing (See Union Exhibits P and R) to the Union's March 22nd and March 30th RFIs and repeated its familiar refrain that the Hotel does not presently have any plans to re-open the Hotel as a transient hotel; for alternative uses of the Hotel; or sell or transfer the Hotel. In addition, it claimed that "Based on the information presently known to RHC, it is not aware of any documents or information not previously produced and responsive to the Union Letters, prior Union subpoenas, and other requests for information in this matter."

As the record of this case shows, such representation was false.

**Dr. Najeeb Samie and Faisal Abdul Ghaffar Attempts to Avoid Giving Testimony**

The Union, frustrated by the Hotel's stonewalling and specious claims that it had no documents or information responsive to the Union's Subpoenas or RFIs, served two (2) witness subpoenas on Hotel Counsel on June 1, 2021 compelling Dr. Najeeb Samie and Faisal Abdul Ghaffar ("Ghaffar") to appear and give testimony at the June 10, 2021 hearing scheduled in this matter. On the eve of the June 10, 2021 hearing, the Hotel filed a last-minute motion to quash the Union's witness subpoenas. The following day, neither Dr. Samie nor Ghaffar were made available to testify, notwithstanding that the Impartial Chairperson denied the Hotel's motion to quash the witness subpoenas compelling their testimony. As such, the parties agreed that both witnesses would appear and give testimony at a re-scheduled hearing on June 21, 2021. Yet, on June 17, 2021, Hotel counsel advised the Impartial Chairperson and Union counsel, via e-mail, that he was unable to secure the appearances of Dr. Samie and Ghaffar to testify at the June 21st hearing and, over the strenuous objections of the Union, the hearing was re-scheduled to July 7, 2021.

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 10 of 51

As it turned out, the Hotel's claim that Dr. Samie and Ghaffar were unavailable to testify at the June 21, 2021 hearing in this matter was false. When Dr. Samie and Ghaffar finally testified on July 7, and 8, 2021, respectively, they both admitted they were in New York City beginning on June 17, 2021 and stayed here for approximately ten (10) days. Further, while Dr, Samie claimed he was unavailable to testify due to a medical procedure, he admitted that he had sufficient time to tour and inspect the Hotel, as well as meet with Aimbridge representative Ed Netzhammer to discuss the status of the Hotel. Ghaffar did not offer any excuse as to why he was unable to testify on June 21, 2021.

**Incredible Testimony of Dr. Samie and Ghaffar**

Dr. Samie testified that he was the Managing Director and Chairperson of the Board of Directors of RHC, as well as the President of PIA which solely owned RHC through an intermediary company Roosevelt Hotel Cooperation N.V. ("RHC NV"). He admitted that RHC, RHC NV and PIA each held Board of Directors meetings at which decisions affecting the respective companies' assets were discuss therein, including the status of the Hotel. Dr. Samie further admitted that each company kept written minutes of each of their Board of Directors ("BOD") meetings in the ordinary course of business and that each company had organizing documents (e.g. operating agreements, partnership agreements, etc.) which would set forth the ownership and controlling interests in each company. When shown the Subpoenas and pending Union RFIs, he could not explain why copies of the BOD minutes and organizing documents for each company were not provided to the Union.

Dr. Samie also testified that while RHC, as the nominal owner of record of the Hotel, had the authority to make decisions regarding the Hotel, including the decision to close which he couldn't remember when such decision was made, PIA played a large role in decisions affecting the Hotel.[ In fact, Hotel counsel informed the Impartial Chairperson that a meeting between Union President Richard Maroko and the PIA Chairperson _____would be taking place the same week of the last hearings in this matter concerning the status of the Hotel and to begin impact bargaining.] Dr. Samie was also involved in such decisions as the President of PIA. He further admitted that PIA was solely owned by Pakistani International Airlines Company Limited ("PIACL") which shares were owned by the Pakistani government and that earlier this year he was required to give a presentation to Pakistan's Aviation Division regarding the status of the Hotel.[ Dr. Samie promised to provide the Union with the percentage of shares of PIAL owned by the Pakistani Government but, like all promises made by the Hotel counsel, such promise went unfulfilled.] As Dr. Samie explained, the Aviation Division regulated PIACL and its owned assets, including the Hotel.

Additionally, while Dr. Samie initially testified that there were no documents or communications regarding discussions concerning potential alternate uses of the Hotel or a potential sale or transfer of the same, he later confessed that the Hotel had commissioned a study and analysis by Deloitte Touche ("DT analysis") which was completed in late 2019 regarding potential uses and/or sale or transfer of the Hotel. When shown the Union's Subpoenas and pending RFIs, he could not explain why the DT analysis was not turned over to the Union.[ Hotel counsel represented that the DT analysis would be turned over to the Union but to date the Hotel has failed and refused to do so.]

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 11 of 51

Incredibly, Dr. Samie still claimed that there had not been any formal discussions regarding potential alternate uses of, or sale or transfer of the Hotel, or its possible re-opening as a transient hotel, notwithstanding that the Hotel is an asset valued at between $500-700 million dollars and is losing millions of dollars a month by remaining closed. Yet, somehow, the Hotel was able to obtain a $142 million dollar loan from the National Bank of Pakistan ("Bank"), secured by a mortgage on the Hotel, to pay off existing debt and continuing liabilities in connection with the closure of the Hotel. Dr. Samie was unclear about the details of the paperwork filed by the Hotel to secure the loan and mortgage.

Ghaffar's testimony was equally as vague and contradictory as Dr. Samie's testimony. He testified that he was RHC's Director of Finance and PIA's Executive Vice President and that RHC made decisions regarding the Hotel. Yet, he could not explain why all the communications regarding the closure of the Hotel between the Hotel Manager and him was in his role as PIA officer and not as an RHC officer. Further, when asked if PIALC, PIA and RHC followed consolidated financial statements, he couldn't recall. His lack of memory also plagued him in regards to the $142 million dollar loan obtained by the Hotel from the Bank. He acknowledged that the Hotel had completed a loan application in order to obtain the $142 million dollar loan to re-pay existing debt on the Hotel and agreed that typically in a loan application, the applicant would have had to provide information to the lender with regards to its ability to re-pay the loan. He, however, could not remember what information the Hotel provided in the loan application to the Bank in regards to how it would be able to re-pay the loan (e.g. projected operating revenue from Hotel; proceeds from sale or transfer of Hotel; funding from a lease or joint venture ownership of Hotel, etc.).[ It should be noted that Hotel counsel requested time to consult with his client after this line of questioning with regards to any issues which may arise regarding the accuracy of its loan application.]

In short, both Dr. Samie's and Ghaffar's testimony was evasive and inconsistent with regards to which entity or entities own and control the Hotel; who were the decision makers regarding the same; what possible uses of the Hotel were being considered and how the Hotel was able to obtain a $142 million dollar loan without providing any reliable proof that it would be able to repay the same, especially where the Hotel was supposedly permanently closed with no projected future revenue. On the other hand, their testimony was crystal clear on one point - that the Hotel had documents in its possession that were responsive to the Subpoenas and the Union's RFIs but were not turned over to the Union.

## ARGUMENT

### I.

### THE ACT REQUIRES THE HOTEL TO PROVIDE THE INFORMATION REQUESTED BY THE UNION

Pursuant to Section 8(a)(5) of the National Labor Relations Act (the "Act"), an employer, upon request, has a duty to furnish its employees' bargaining representative with information that is relevant and necessary to the performance of its statutory duties. See NLRB v. Acme Industrial Co., 385 U.S. 432 (1967).[Copies of cited cases, decisions and arbitration awards are annexed hereto as Exhibit "A."] In fact, an employer has an obligation to furnish the bargaining representative with the requested information if

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 12 of 51

there is merely a probability that such information is relevant and will be of use to the union in fulfilling its statutory duties and responsibilities as the employees' exclusive bargaining representative. Bentley-Jost Electric Corp., 283 NLRB 564, 567 (1987). To determine the relevancy of the requested information, the National Labor Relations Board ("Board") applies a liberal discovery-type standard. As the Board explained in Dodger Theatricals Holdings, Inc., a union's burden to show relevancy is not exceptionally heavy. The test of the union's need for the information sought is simply a showing that the desired information is relevant, i.e. would be useful to the union in carrying out its statutory duties and responsibilities. 347 NLRB 953, 967 (2006).

A. **Requested Information For Impact Bargaining**

The statutory duty of an employer to provide a collective bargaining representative requested information encompasses not only material necessary and relevant for the purpose of contract negotiations but also information necessary for the administration of a collective-bargaining agreement, including information required by a labor organization to process a grievance, and for effects bargaining. See Delaware County Memorial Hospital, 366 NLRB No. 28 (2018)(Board orders hospital employer to provide the Union with a copy of the Asset Purchase Agreement under which it was being sold); Beth Abraham Health Services, 332 NLRB 1234 (2000)(Board orders employer to turn over documents regarding transfer of ownership); Super Valu Inc.-Pittsburgh Div. v. NLRB, 184 F.3d 949 (8th Cir. 1999)(enfd. Board decision ordering employer to turn over to copy of sales agreement with purchaser); Las Vegas Sands, Inc., 324 NLRB at 1109 (1997)(citing to Acme Industrial, (supra); Bacardi Corp., 296 NLRB 1220 (1989); Challenge-Cook Bros., 282 NLRB 21, 28 (1986)); Providence Hospital, 320 NLRB 790 (1996)(Board orders hospital to provide copies of documents regarding consolidation or merger of hospital employer with another hospital); Transcript Newspapers, 286 NLRB 124 (1987)(Board orders employer to provide copies of sales agreement with purchaser)

Las Vegas Sands appears to be on all fours with this case. In that case, shortly after contract negotiations with a hotel and casino employer were concluded, labor unions learned from media reports that the hotel and casino would be closing down and ceasing operations. Id. The unions were puzzled by this as the employer had made no mention of any such closure or cessation of operations during negotiations, and, in fact, explained that it would be renovating and expanded its operations. Id. In an effort to prepare for effects bargaining, the union requested, inter alia, "Any copies of minutes or records of any pertinent meetings at which the tear down and rebuilding of the property was discussed and any written communications announcing the results of those discussions …. " (emphasis added). Id. The employer failed and refused to provide the requested information to the unions and the Board found that such information was necessary for the unions in  regards to effects bargaining and, therefore, the employer's refusal violated Sections 8(1) and (5) of the Act. Id. In the case at bar, the Hotel engaged in the same violative conduct.

The Hotel announced that the Hotel was permanently closing on October 31, 2020. News reports indicated that the post-closure uses of the Hotel would include conversion to residential/commercial use. Muck like the labor unions in Las Vegas Sands, the Union in this case requested information from the

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 13 of 51

Hotel regarding discussions concerning the use of the Hotel property. Specifically, the Union requested in the October 9th Subpoena, January 28th RFI and March 22nd RFI any and all documents and communications relating to potential alternate uses of the Hotel and/or sale or transfer of the Hotel. Moreover, Union counsel made it crystal clear in the March 22nd RFI that the Union's request for information was not limited to the Hotel's "plan" for alternate uses or sale or transfer of the Hotel, but also included any "discussions" of the same. Union counsel also repeatedly advised the Hotel in writing that the requested information was necessary for the Union to prepare for impact a/k/a effects bargaining. Yet, the Hotel did not provide one document or communication responsive to the Union's requests for information, notwithstanding that its officers admitted under oath the existence of such documents, i.e. DT analysis; BOD meeting minutes; Dr. Samie's presentation to Pakistan's Aviation Division regarding status of the Hotel and its loan and mortgage applications.[ The Hotel's officers would have the Impartial Chairperson believe that the Bank would lend the Hotel $142 million dollars secured by a mortgage on the Hotel without requiring proof, i.e. documentation in connection with its loan and mortgage application, that the Hotel would be able to repay the loan from some source of funding other than revenue from the Hotel which it claimed was permanently closed.]

**B. Requested Information For Contract Administration**

Besides information necessary for effects bargaining, an employer's statutory duty to provide a union with requested information extends to information that is relevant to contract enforcement and administration. Allison Corp., 330 NLRB 1363, 1367 (2000); NLRB v. Truitt Mfg. Co., 351 U.S. 149 (1956). Further, the union need not demonstrate that the information sought is certainly relevant or clearly dispositive of the basic issues between the parties. Westinghouse Electric Corp., 239 NLRB 106, 107 (1978). The requested information need only have some bearing on the issues between the parties. W L Molding Co., 272 NLRB 1239 (1984). The Union easily meets such a light burden in this case.

The Union requested information from the Hotel regarding any alternate uses of the Hotel post-closing as it learned from news reports that the Hotel was considering conversion of the Hotel to residential/commercial use. As Union counsel explained in his November 1, 2020 follow-up letter to the Hotel, the information sought was relevant to whether Article 57 of the IWA was or would be triggered. The same purpose of contract administration led to the Union's repeated requests for any documents or communications relating to discussion regarding a potential sale or transfer of the Hotel. As both Union General Counsel Bokerman in the Jan. 28th RFI and Union counsel in the March 30th RFI explained, this requested information was necessary for the Union to investigate any potential IWA Article 59 issues or violations. Further, Union counsel in his April 16, 2021 follow up letter expressly referred to Impartial Chairperson's Article 59 decision in the Wagner Hotel as a basis for the Union's request in the March 30th RFI for copies of any documents or information relating to a mortgage taken out on the Hotel.

Additionally, the Board has consistently held that information sought by a labor organization to clarify the relationship between a signatory party to a collective bargaining agreement and other parties is relevant if such information is necessary for the administration of the contract or

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 14 of 51

statute. See Piggly Wiggly Midwest, Inc., 357 NLRB No. 191 (2012)(alter ego suspicion); Pulaski Contracting Co., 345 NLRB 931 (2005)(alter ego allegation); Contract Flooring Systems, 344 NLRB No. 117 (2005)(alter ego and double breasting allegation); Compact Video Services, 319 NLRB 131, 142-143 (1995), enfd. 121 F.3d 478 (9th Cir. 1997)(employer required to furnish a union with information relating to a proposed or completed sale, including sales agreements to determine whether purchaser was a "successor"). As such, the Union's request for "Any and all documents, including but not limited to unredacted all operating agreements, articles of incorporation, partnership agreements, identifying any individuals or entities having a direct or indirect ownership, management or controlling interest in RHC Operating LLC" was relevant to the Union's contract administration, especially in light of the corporate shell game that Dr. Samie and Ghaffar attempted to play when testifying under oath as to whic entity or entities owned  and/or controlled the Hotel.

Indeed, this requested information is the same type of requested information that Impartial Chairperson found in the Carter Hotel was required to be produced by a hotel employer under the IWA. IC Award #2015-38 (IC Drogin, July 3, 2015). Impartial Chairperson Drogin further found that the failure of the hotel to provide such information violated the IWA and the Act and penalized the hotel millions of dollars for such failure. IC Award #2015-38; IC Award #2016-16 (IC Drogin, April 5, 2016). Yet, the Hotel still failed to provide the requested information to the Union.

Accordingly, notwithstanding the presumptively relevance of the Union's requests for information in furtherance of its contract administration, no such information was provided by the Hotel.

**II.**
**THE IMPARTIAL CHAIRPERSON SHOULD PENALIZE THE HOTEL FOR ITS FAILURE TO PROVIDE THE UNION WITH THE REQUESTED INFORMATION**

### A. Impartial Chairperson Has Broad Powers to Penalize Hotel-Employers for Failure to Provide Information

It is well settled that the Office of the Impartial Chairperson ("OIC" or "IC") has broad powers under the IWA to penalize hotel-employers for failure to provide the Union with requested information. See Chelsea Grand, LLC, IC Award #2017-44 (IC Drogin, Sept. 29, 2017)(total penalty of $4,402,000.00); Chelsea Grand LLC, IC Award #2016-24 (IC Drogin, May 10, 2016)(impose daily penalty of $35.500 for failure to provide names, addresses and phone numbers of bargaining unit employees); Carter Hotel, IC Award #2016-16 (IC Drogin, April 5, 2016) (impose daily penalty of $17,500 for failure to provide information regarding ownership and/or controlling interest); Chelsea Grand, LLC, IC Award #2007-16 (IC Drogin, Feb. 16, 2007)(impose daily penalty of $35,500 for failure to provide W-2s), confirmed in Chelsea Grand LLC v. N.Y. Hotel & Motel Trades Council, AFL-CIO, No. 07 Civ. 2614(PAC), 2014 WL 4813028 (S.D.N.Y. Sept. 29, 2014), aff'd, 629 F. App'x 152 (2d Cir. 2015).
In this case, the Impartial Chairperson in both IC Award #2020-40 and a bench order issued at a November 5, 2020 hearing directed the Hotel to fully comply with the Subpoenas issued by the Union in October 2020. The Hotel, now ten (10) months later, has still failed to fully comply with the Subpoenas. Moreover, the Hotel has, to date, failed and refused to produce

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 15 of 51

even one page of any documents or communications responsive to the four (4) RFIs sent by the Union, with the last RFI sent almost six (6) months ago. Furthermore, its claims and representations, in writing and verbally, that it had no documents responsive to the same, was revealed to be a fallacy based upon the very words of the Hotel's principals.[ Dr. Samie's additional claim that the Hotel had no plans, much less had discussed, potential uses or sale or transfer of the Hotel post-closing not only defies reality but would have the Impartial Chairperson believe that a party would not even consider how to use a property valued at between $500-700 million dollars to stem losing millions of dollars a month.]

The testimony of Dr. Samie and Ghaffar revealed, at a minimum, the existence of the DT analysis; BOD meeting minutes; Dr. Samie's presentation to Pakistan's Aviation Division; and loan and mortgage applications and documents, all of which were clearly responsive to the Union's Subpoenas and RFIs. Yet, both Dr. Samie and Ghaffar had no explanation whatsoever why such responsive documents were not turned over to the Union. Additionally, their promises made at the July 7 and 8, 2021 hearings in this matter to turn over the same ring hollow as no such documents have yet been produced.

Moreover, any production of information by the Hotel at this late date would not cure the Hotel's violations of the IWA and the Act. As the Board explained in IronTiger Logistics, Inc., an employer must not only provide relevant information requested by a union, but must do so in a timely manner. 359 NLRB No. 13 (2012), *vacated by* NLRB v. Noel Canning, 134 S.Ct. 2550 (2014)(President did not have constitutional authority to make recess appointments to the Board), *rationale adopted by Board in decision de novo*, IronTiger Logistics, Inc., 362 NLRB No. 45 (2015). See also Providence Hospital, 320 NLRB 790 (1996) (The fact that an employer ultimately provided a union the requested information did not satisfy its obligation to timely furnish the information or make a remedy unnecessary) (citing to Mary Thompson Hospital, 296 NLRB 1245, 1250 (1989), enfd. 943 F.2d 741 (7th Cir. 1991). In this case, the Hotel has not fully complied with the Union's Subpoenas that were issued ten (10) months or produced any information responsive to the Union's RFIs which were last sent over six (6) months ago. As such, Hotel counsel's suggestion that it would finally produce any requested information if ordered by the Impartial Chairperson does little to remedy the Hotel's violation of the IWA and the Act.

The Hotel's "hide the ball" strategy in this case is even more egregious in light of Dr. Samie and Ghaffar's testimony under oath that they were present in New York City while at the same time their counsel was representing to the Impartial Chairperson that they were unavailable to testify at an agreed upon scheduled June 21, 2021 hearing in this matter. Accordingly, the Impartial Chairperson should exercise the afore-cited broad powers of the OIC to penalize the Hotel for its blatant and deliberate refusal to provide the Union with its requested information, as well as its failure to comply with the orders of the Impartial Chairperson and the OIC.

### B. Impartial Chairperson Should Draw Adverse Inference that Hotel is Converting Hotel to Residential Use and Order IWA Article 57 Severance Pay

The adverse inference rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 16 of 51

rise to an inference that the evidence is unfavorable to him. *2 J. Wigmore, Evidence § 285* (3d ed. 1940)]. As Professor Wigmore explained:

> ... The failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would thereby be elucidated, serves to indicate, as the most natural inference, that the party fears to do so, and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party. These inferences, to be sure, cannot fairly be made except upon certain conditions; and they are also always open to explanation by circumstances which make some other hypothesis a more natural one than the party's fear of exposure.

> But the propriety of such inference in general is not doubted.

See also, Elkouri and Elkouri, *How Arbitration Works* (BNA, 5th ed.) at 428 ("... a party's failure to use witnesses who should be knowledgeable creates an inference against that party ... failure to call a witness who is available to a party gives rise to a presumption that the witness's testimony would be adverse to the position of the party having the ability to call that witness").

Most importantly, the adverse inference rule is also applicable to the failure to produce documents as requested. See, *How Arbitration Works supra* at 427 ("'An arbitrator has no right to compel the production of documents ... by either side ... [h]e may, however, give such weight as he deems appropriate to the failure of a party to produce documents on demand' "); Hill and Sinicropi, *Evidence In Arbitration,* (BNA, 2nd ed.) at 303 ("... [I]n the event a party refuses to honor a request for relevant information, an arbitrator may properly draw an adverse inference against the recalcitrant party"). See also, Department of Health & Human Servs., Soc. Sec. Admin., 86 BNA LA 1205, 1211 (Kubie, 1986) ("If I learn that one party without good cause has withheld or is withholding pertinent information subject to its control from the other—or from me—I make it clear at an early stage that I will be free to assume, should it seem appropriate to do so, that the withheld, repressed or concealed information would undercut the position of the party in whose control it is."); Barnard Eng'g Co., 86 BNA LA 523, 528 (Brisco, 1985) ("[His] deliberate and calculated refusal to comply with the subpoena, regardless of its legal effectiveness, compels the conclusion that had he brought the subpoenaed documents they would have been adverse to his position. …"). Further, "while the adverse inference rule in no way depends upon the existence of a subpoena, it is nonetheless true that the willingness of a party to defy a subpoena in order to suppress the evidence strengthens the force of the preexisting inference." PAS, LLC, 2016 WL 4578797 (Benn, 2016)(quoting from UAW v. NLRB, *supra*, F.2d 1329, 1338 (D.C. Cir. 1972). Arbitrators will consistently apply the adverse inference rule against an employer who refuses to provide a union with requested relevant information. See Clearview Glass and Glazing, 2021 WL 278813 (Bankston, 2021)(arbitrator drew adverse inference against employer who failed to provide the union with subpoenaed information notwithstanding a court order compelling compliance with the Subpoena); PAS, LLC, 2016 WL 4578797 (arbitrator draws adverse inference against employer that had the

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 17 of 51

documents requested and subpoenaed by the union been produced, which they were not, they would not have supported the employer's position in the arbitration); New American Restoration, Inc., 2015 WL 5937496 (Harris, 2015)(arbitrator drew adverse inference against employer who failed to provide requested payroll records); Stewart-Sutherland, Inc., 2002 WL 35018826 (Allen, 2002)(arbitrator drew adverse inference against employer who refused to provide union with requested financial information).

In this case, the Hotel's deliberate and on-going refusal to provide the Union with the information requested in its Subpoenas and RFIs mandates that the Impartial Chairperson draw an adverse inference against it. Specifically, amid news reports that the Hotel was going to be re-developed and converted into residential/commercial uses, the Union requested multiple times in its Subpoenas and RFIs any information regarding alternate use of the Hotel post-closing. The undisputed evidence shows that the Hotel has failed and refused to provide this requested information notwithstanding the admission by the Hotel's principals that such responsive documents exist. Further, the Hotel's refusal to provide this information is linked to its repeated refrain that IWA Article 57 (conversion of hotels to residential use) has not yet been triggered. The Impartial Chairperson need look no further than the first correspondence sent by the Hotel to the Union, even before its closure, as evidence of the Hotel's fear that the Union may have an Article 57 claim. The Hotel, in its October 4, 2020 correspondence wrote "The Article 57 calculations are not applicable to the situation at the hotel as it is simply a closure.

There are no plans that would result in this article applying" without the Union even inquiring concerning the same. Thereafter, in its February 9, 2021 response to the January 28th RFI, the Hotel felt compelled, again, to comment that "…the Owner presently has no obligation pursuant to Article 57". (emphasis added)  The Hotel repeated this same representation in its March 31, 2021 response to the March 22nd RFI.

The Hotel has consistently refused to comply with the Subpoenas and Union's RFIs regarding alternate uses of the Hotel which bear upon the issue of whether the Hotel's obligations under Article 57 of the IWA has been or will be triggered. As such, the Impartial Chairperson should draw an adverse inference that the requested documents which have not been produced would undermine the Hotel's statements to date that it presently has no obligations under Article 57 of the IWA. Accordingly, the Impartial Chairperson should order the Hotel to pay each bargaining unit employee the additional severance as provided in Article 57.

Additionally, the Hotel's refusal to comply with the Subpoenas and RFIs regarding a potential sale or transfer of the Hotel and any mortgage documents also mandates that the Impartial Chairperson draw an adverse inference that the Hotel has engaged in transaction(s) which trigger Article 59 obligations, including a mortgage which may violate Article 59 (See Wagner Hotel award). [The Union reserves its right to seek additional remedies at a second hearing with regards to Article 59 obligations.]

**CONCLUSION**

For all of the reasons set forth above, the Union respectfully requests an Award finding that the Hotel violated the IWA and Act by failing to timely provide the Union with the information requested in the Subpoenas

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 18 of 51

and RFI; draw an adverse inference that the Hotel is hiding information from the Union regarding its post-closure use of the Hotel in order to avoid the Union enforcing IWA Article 57 which requires the Hotel to pay additional severance pay, and direct the Hotel to pay each bargaining unit employee an amount equal to the severance pay provided for in Article 57 of the IWA. The Impartial Chairperson should also retain jurisdiction to determine what additional remedies and/or penalties to award based upon the Hotel's blatant refusal to provide documents in its possession responsive to the RFIs.

**REPLY BRIEF IN SUPPORT OF UNION'S APPLICATION FOR AN ORDER PENALIZING THE HOTEL'S NON-COMPLIANCE WITH THE UNION'S REQUESTS FOR INFORMATION**

**PRELIMINARY STATEMENT**

The New York Hotel and Motel Trades Council, AFL-CIO ("Union") submits this brief in reply to the post-hearing brief of the Roosevelt Hotel ("Hotel") and in further support of the Union's application to the Impartial Chairperson for an order penalizing the Hotel for its failure and refusal to comply with the Union's requests for information (collectively "RFIs"). The Hotel's argument that the Union's dispute with it concerning the RFIs is not suitable for arbitration ignores the IWA Article 26's broad arbitration clause and well-settled arbitral precedent in which the Office of the Impartial Chairperson has ordered hotel-employers to comply with Union RFIs and penalized the same for non-compliance. The Hotel's argument that the Union did not put the Hotel on notice of the Union's claim in this case, i.e. failure to provide information, is not only another case of willful ignorance by the Hotel but undermined by the overwhelming documentary evidence in this case. The Hotel also fails to assert any cogent argument why the Union was not entitled to the requested information nor why the Union should have to reply upon the Hotel's representation as to the contents of the same without allowing the Union to review the same. Most egregious is not only the Hotel's attachment of post-hearing exhibits without the consent of the Union or permission of the Chairperson, but that one of the exhibits is a document within the scope of the RFIs, but not previously turned over to the Union. The Hotel's belated document production does not cure its violation of the National Labor Relations Act or the IWA.

As such, the Chairperson should draw an adverse inference that the Hotel is hiding information from the Union regarding its post-closure use of the Hotel in order to avoid the Union enforcing IWA Articles 57 and/or 59 and order the Hotel to pay each Hotel employee an amount equal to the severance pay provided for in Article 57 of the IWA. The Impartial Chairperson should also retain jurisdiction to determine what additional remedies and/or penalties to award based upon the Hotel's continued refusal to provide documents in its possession responsive to the RFIs.

**ARGUMENT**

**I.**

**HOTEL'S ARGUMENT THAT THERE IS NO PENDING ISSUE SUITABLE FOR THE CHAIRPERSON TO RESOLVE IS MERIT LESS**

The Hotel's argument that there is no pending contract grievance for the Chairperson to decide and, therefore, the Union's claim should be

dismissed ignores the language of Article 26 of the IWA. Article 26 of the IWA provides, in part:

> All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairman, and his/her decision shall be final and binding upon the parties hereto. Any questions regarding arbitrability, substantive, procedural, or otherwise, or regarding the Impartial Chairperson's jurisdiction or authority, shall be submitted to the Impartial Chairperson in accordance with this Article. [emphasis added]

This unambiguous language makes clear that the broad jurisdiction of the Office of the Impartial Chairperson ("OIC") is not limited to grievances alleging violations of the IWA as argued by the Hotel. Instead, construing this arbitration clause, the Second Circuit has stated: "No grievance — either specific or general - is excluded from this broad coverage." Pitta v. Hotel Association of New York City, Inc., 806 F.2d 419, 422 (2d Cir. 1986).[ Cited decisions are attached hereto as Exhibit "A".] The Courts of this Circuit have consistently followed suit by giving this very arbitration clause the broadest possible interpretation. See e.g., New York Hotel & Motel Trades Council v. Alphonse Hotel Corp., 2001 U.S. Dist. LEXIS 12682 (S.D.N.Y. 2001); New York Hotel and Motel Trades Council, AFL-CIO v. Hotel Association of New York City, Inc., 1993 WL 485560 (S.D.N.Y. 1993, Sotomayor, J.); New York Hotel and Motel Trades Council, AFL-CIO v. Hotel Nikko of New York, Inc., 1991 WL 168284 (S.D.N.Y. 1991, Edelstein, J.); Vito J. Pitta v. Waldorf-Astoria Corp., 644 F.Supp. 844 (S.D.N.Y. 1986).

Moreover, both the courts in this Circuit and the OIC have recognized the broad scope of IWA Article 26 to include the resolution of statutory claims. Then United States District Court Judge Denny Chin held that even statutory claims normally committed to the U.S. National Labor Relations Board ("NLRB" or "Board") must be submitted to the Office of the Impartial Chairman in light of the extraordinarily broad arbitration provisions of the IWA. Alphonse Hotel Corp. v. New York Hotel & Motel Trades Council, 2004 WL 414836, 174 LRRM (BNA) 2690 (S.D.N.Y. 2004). United States District Court Judge Richard Berman followed suit and concurred with Chairperson Ira Drogin on the broadness of IWA Article 26 to include the submission and remedy of statutory claims when confirming IC #2017-09. New York Hotel & Motel Trades Council, AFL-CIO v. CF 43 HOTEL, LLC; 250 West 43 Owner, LLC; 250 West 43 Owner II, LLC; 250 West 43 Owner III, LLC, d/b/a Carter Hotel. 2017 WL 2984168 (S.D.N.Y. June 14, 2017).

The OIC has also recognized the broad scope of IWA Article 26 in adjudicating and resolving claims that hotel-employers have violated the National Labor Relations Act (the "Act") by failing to provide the Union with requested information. See Chelsea Grand, LLC, IC Award #2017-44 (IC Drogin, Sept. 29, 2017); Chelsea Grand LLC, IC Award #2016-24 (IC Drogin,

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY  10036**
**TEL:  (212) 541-7212  FAX:  (646) 992-8103**

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 20 of 51

May 10, 2016); <u>Carter Hotel</u>, IC Award #2016-16 (IC Drogin, April 5, 2016); <u>Chelsea Grand, LLC</u>, IC Award #2007-16 (IC Drogin, Feb. 16, 2007), confirmed in <u>Chelsea Grand LLC v. N.Y. Hotel & Motel Trades Council, AFL-CIO</u>, No. 07 Civ. 2614(PAC), 2014 WL 4813028 (S.D.N.Y. Sept. 29, 2014), aff'd, 629 F. App'x 152 (2d Cir. 2015).

Therefore, the Hotel's argument that the Union's claim that the Hotel violated the Act for failing to comply with the Union's RFIs was not suitable for arbitration before the Chairperson is frivolous.

Equally frivolous is the Hotel's assertion that the Union failed to provide sufficient notice to the Hotel of its claim in this case. As acknowledged by the Hotel, the caption of this matter included a claim for "…failure to provide information" which followed the Hotel's failure to provide information requested in the Union's October 9, 2020 Subpoena Duce Tecum ("Subpoena"). In fact, the Chairperson issued an award on October 20, 2020, IC Award #2020-40, in which he not only ordered the Hotel to comply with the Subpoena, but retained jurisdiction should the Hotel fail to comply with his order, which it never fully did. Furthermore, the Union not only put the Hotel on notice each and every time when it failed to comply with one of its subsequent RFIs, but advised the Hotel that it would submit such failure to the Chairperson for adjudication. <u>See</u> Union Exhibits F-G, I, Q-S. Additionally, the Union not only had numerous telephonic conferences with the Chairperson and Hotel counsel in which the Union explained the failure to comply claim to the Hotel, but the Hotel's own post-hearing brief exhibit 6, i.e. July 13. 2021 e-mail sent by Union counsel, undermines the professed ignorance by the Hotel of the same. The e-mail details not only the Hotel's failure to fully comply with the RFIs but provides some examples of documents that existed but which the Hotel had failed to turn over to the Union. Simply put, the Hotel's assertion that it lacked sufficient notice of the Union's claim in this case is a bald-faced lie.

## II.

## HOTEL'S ARGUMENT THE UNION HAS NOT PROVEN ARTICLE 57 OR 59 IS <u>APPLICABLE OR HAS BEEN VIOLATED IS A RED HERRING</u>

The Hotel's argument that the Union has not proven Article 57 or 59 of the IWA is applicable to the Hotel or that either has been violated is irrelevant and demonstrates a fundamental misunderstanding of a labor union's right to information from an employer. As set forth in the Union's initial post-hearing brief ("Brief"), an employer's statutory duty to provide a union with requested information extends to information that is relevant to contract enforcement and administration. <u>Allison Corp.</u>, 330 NLRB 1363, 1367 (2000); <u>NLRB v. Truitt Mfg. Co.</u>, 351 U.S. 149 (1956). Moreover, requested information necessary for proceeding with and arguing grievances under a collective-bargaining agreement, including that necessary to decide whether to proceed with a grievance or arbitration, must be provided by an employer. <u>Yeshiva University</u>, 315 NLRB 1245 (1994)(citing to <u>NLRB v. Acme Industrial Co.</u>, 385 U.S. 432, 437-438 (1967); <u>American National Can Co.</u>, 293 NLRB 901 (1989); <u>United Technologies Corp.</u>, 274 NLRB 504 (1985); <u>Eazor Express</u>, 271 NLRB 495 (1984)).

As Union counsel explained in his November 1, 2020 follow-up letter to the Hotel, the information requested by the Union was in furtherance of investigating whether Article 57 of the IWA was or would be triggered. The

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY  10036**
**TEL: (212) 541-7212  FAX: (646) 992-8103**

same purpose of contract administration led to the Union's repeated requests for any documents or communications relating to discussions regarding a potential sale or transfer of the Hotel. As both Union General Counsel Bokerman in the Jan. 28th RFI and Union counsel in the March 30th RFI explained, this requested information was necessary in furtherance of investigating whether Article 59 was or would be triggered. Union counsel in his April 16, 2021 follow up letter also expressly referred to the Chairperson's Article 59 decision in the Wagner Hotel as a basis for the Union's request in the March 30th RFI for copies of any documents or information relating to a mortgage taken out by the Hotel. As the Chairperson found in the Wagner Hotel, Article 59 of the IWA is violated where a hotel enters into a mortgage which provides for a contingent transfer of ownership, management or control of a hotel to a lender without requiring it to assume all terms of the IWA. As such, the Union's request for information regarding a mortgage taken out by the Hotel which both Dr. Sammie and Ghaffar confirmed had taken place with the National Bank of Pakistan was clearly relevant to investigating whether an Article 59 violation had occurred. Yet, the Hotel has not produced any of the requested information.

Furthermore, as the Union established in its Brief (See Brief at page 16), the Hotel was required both under the Act and the IWA to provide requested information to clarify the relationship between it and its related and affiliated entities, in order for the Union to administer and enforce the terms of the IWA with regards to the Hotel. See Piggly Wiggly Midwest, Inc., 357 NLRB No. 191 (2012); Carter Hotel, IC Award #2015-38 (IC Drogin, July 3, 2015). Moreover, the need for the information requested by the Union, i.e. "Any and all documents, including but not limited to unredacted all operating agreements, articles of incorporation, partnership agreements, identifying any individuals or entities having a direct or indirect ownership, management or controlling interest in RHC Operating LLC", is even more compelling based upon the Hotel's contradictory statements in its post-brief ("Hotel Brief") that while it will comply with all of its obligations under the IWA, including Articles 57 and 59  (See Hotel Brief at page 17, fn. 14), it reserves its right to argue that it is not bound to the IWA nor any contractual obligations thereunder (See Hotel Brief at 5, fn. 3-5).

Lastly, the Hotel's citation to three (3) pages in response to the Union's afore-mentioned request for information falls woefully short in complying with the same, especially where the Hotel concedes the existence of minutes of Board of Directors meetings which would show which entity or entities actually control decision-making regarding the Hotel, but which still have not been produced. The same lack of compliance extends to Dr. Sammie's presentation to a Pakistani government committee which clearly relate to the degree of control the Pakistani government has with regards to the Hotel.

**III.**
**UNION DOES NOT HAVE TO ACCEPT HOTEL'S REPRESENTATIONS AND STATEMENTS IN LIEU OF THE REQUESTED INFORMATION**

The Board has recognized that a labor union doesn't have to accept answers or assertions made by employers in lieu of receiving requested information necessary for the union to draw its own conclusions regarding

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 22 of 51

enforcement of a collective bargaining agreement, See Metro Food, Inc., 289 NLRB 1107 (1988), or how to proceed in effects bargaining. See Las Vegas Sands, Inc., 324 NLRB at 1111 (1997). Therefore, contrary to Hotel counsel's suggestion that the Union and the Chairperson accept his representations regarding the contents of the Hotel's mortgage and loan documents, the Union is entitled to the requested information regarding the same in order to determine whether a Wagner Hotel Article 59 violation may have occurred, as well as to ascertain whether the Hotel informed the National Bank of Pakistan of any future plans for the Hotel in connection with its application for a loan and mortgage.[ The Hotel's reliance on Townhouse 44, IC#2006-54 is misplaced as the Union in that case accepted the hotel's written representations as a satisfactory response to its request for information, whereas the Union's basis for refusing to accept the Hotel's representation in the instant matter is reasonable in light of the plethora of news articles to the contrary. Moreover, contrary to the Hotel's claim in this case, there is evidence of an actual transaction, i.e. a mortgage.]

In the same vein, the Union is entitled to and the Hotel should produce copies of the minutes of the Board of Directors meetings and any reports or presentations made by Dr. Sammie or any other PIAL or PIA or RHC to a Pakistani government committee regarding the Hotel, as opposed to having to accept Hotel counsel representations and/or Dr. Sammie's testimony as to what was discussed or not discussed in the meetings and or reports or presentations. Much like the union in Las Vegas Sands which was skeptical of the hotel-casino's statements regarding its future operations, the Union in this case also has a reasonable basis to question the Hotel's repeated assertions that it has not had any discussions or plans regarding post-closure use of the Hotel when news reports indicate otherwise. Accordingly, the Union is entitled to its requested information in order for the Union to ascertain the veracity of these Hotel's assertions, especially when the assertion that no discussions had taken place was proven false by Dr. Sammie's admission under oath that the Hotel had commissioned a report and analysis prepared by Deloitte Touche ("DT analysis") regarding future uses of the Hotel.

## IV.

## HOTEL'S BELATED DOCUMENT PRODUCTION AND CONFIDENTIALITY CONCERN DOES NOT CURE ITS VIOLATION OF THE ACT

Aside from the impropriety of the Hotel submitting exhibits to a post-hearing brief without an agreement with the Union, the Hotel had the audacity to attach as an exhibit the DT analysis which clearly fell within the scope of the Union's RFIs but which the Hotel previously failed and refused to provide to the Union. As set forth in the Union's brief (See Brief at page 19), an employer must not only provide relevant information requested by a union, but must do so in a timely manner. IronTiger Logistics, Inc., 359 NLRB No. 13 (2012), rationale adopted by Board in decision de novo, IronTiger Logistics, Inc., 362 NLRB No. 45 (2015). See also United State Postal Service, 371 NLRB No. 7 (N.L.R.B.)(July 21, 2021), Providence Hospital, 320 NLRB 790 (1996)(The fact that an employer ultimately provided a union the requested information did not satisfy its obligation to timely furnish the information or make a remedy unnecessary). As such, the Hotel's belated production of just one (1) document in response to the RFIs does not remedy its violation of the Act.

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212   FAX: (646) 992-8103**

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 23 of 51

Equally untimely under the Act is the Hotel's sudden claims of confidentiality raised in connection with its suggestion that only the Chairperson review the requested minutes of the Board of Directors' meetings. <u>See</u> <u>Providence Hospital</u>, 320 NLRB 790 (1996)(employer violated the Act when it only raised confidentiality concerns at unfair labor practice proceeding regarding its refusal to provide requested information). The Hotel did not raise any confidentiality concerns with the Union about the requested minutes at any point before or during any hearings in this matter and only raised in in the Hotel Brief. As such, it cannot avail itself of any confidentiality defense.

**CONCLUSION**

For all of the reasons set forth above, the Union should reject the Hotel's merit less and irrelevant arguments and find that the Hotel violated the IWA and Act by failing to timely provide the Union with the information requested in the Subpoenas and RFIs; draw an adverse inference that the Hotel is hiding information from the Union regarding its post-closure use of the Hotel in order to avoid the Union enforcing IWA Articles 57 and/or 59, direct the Hotel to pay each bargaining unit employee an amount equal to the severance pay provided for in Article 57 of the IWA. The Impartial Chairperson should also retain jurisdiction to determine what additional remedies and/or penalties to award based upon the Hotel's blatant refusal to provide documents in its possession responsive to the RFIs.

**THE HOTEL'S CONTENTIONS**

**Introduction**

This Grievance arises as part of a series of ambiguous and unwarranted claims by the Union following the announcement of the anticipated permanent closure of the Roosevelt Hotel (the "Hotel"), including, *inter alia*, alleged violations of the Industry Wide Agreement (the "IWA"), entered into between the Union and Aimbridge Hospitality [Previously, Interstate Hotels LLC, which merged with Aimbridge Hospitality in 2019. As used throughout, the defined terms "Hotel Manager" and "Aimbridge" include Interstate Hotels LLC.] (the "Hotel Manager" or "Aimbridge") as the employer, manager, and operator of the Hotel. The only ostensible issue remaining is what the plans are for the future of the Hotel – a question that has been asked and answered repeatedly since the closure announcement in October 2020. Despite the Union's attempt to confuse and complicate this straightforward issue, the simple answer is: "we don't know." The Union's refusal to believe not only the Owner's written statements, but Owner's counsels' statements made on the record and the sworn testimony of two witnesses, is not a matter suited for arbitration and cannot give rise to any contractual basis under which the Union may seek or obtain relief.

The series of events leading to this point are relatively straightforward: the Owner, like many other owners of New York City hotels, determined that the Hotel must permanently close for economic reasons arising from the Coronavirus pandemic; Hotel employees were consequently laid off by Aimbridge; such employees were paid Article 52 severance and other payments resulting from the permanent closure in amounts in excess of

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL:  (212) 541-7212   FAX:  (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 24 of 51

$12.5 million; and the Hotel permanently closed its doors on December 18, 2020, with only a skeletal crew of ten bargaining unit employees remaining at the Hotel.

Now, without any allegations of violations of the IWA, violation of any orders from the Impartial Chairperson ("IC") and/or violations of law, the Union seeks to go beyond its rights under the IWA.  Simply put, the Union is seeking additional funds from the Owner for failing to make a decision regarding the future of a hotel that is coping with the unanticipated and devastating impact of the Coronavirus pandemic. For these reasons and those below, the Union's Grievance must be denied in its entirety.

**Arguments IN OPPOSITION TO THE UNION'S GRIEVANCE**

***Presently, there are no Pending Grievances Between the Parties and the Union Has Failed to Set Forth Any Alleged Violations of the IWA or the Law***

The Grievance must be denied because the Union has failed to carry its burden of proof for establishing a violation of the IWA, of any IC order, or law for which relief may be sought. According to the Union, its Hearing Notice for the June 10, 2021 hearing (the "June 10 Hearing") sets forth the relief the Union seeks. In reality, and as shown by the scant evidence introduced into the record over the last nine (9) months, this could not be further from the truth. The Hearing Notice alleges: "Employer's violation of the IWA and the law by, inter alia, their failure to provide WARN notice to Employees; failure to provide requested information; regarding the Employer's willful violation of IWA Article 52(B); and, regarding the Employer's failure to comply with Article 8(A)(ii) of the March 2020 Coronavirus Safety Protocol Agreement." *See* Owner Ex. 2.

Notably, out of these four claims, only one was discussed and heard at the June 10 Hearing and continuation hearings on June 21, July 7, and July 8, 2021 (collectively, the "Hearings"). The Owner has been instructed by the Hotel Manager, and has not been informed otherwise, that there are presently no outstanding issues regarding WARN notices, violations of Article 52(B) – let alone "willful violation[s]," which the Owner would certainly dispute, or compliance with the March 2020 Coronavirus Safety Protocol Agreement, which has never been raised by the Union nor otherwise been discussed in this proceeding. Further, the Union has not demonstrated how the Owner is responsible for WARN notices, paying out any further severance, or compliance with Article 8(A)(ii) of the Safety Protocol Agreement.[ To the extent the Union claims otherwise, the Owner reserves the right to respond at such time.] Aimbridge, not RHC LLC, is the employer of all employees at the Hotel.[ While the Owner acknowledges the definition of "employer" under the IWA and certain articles, such as Article 59(D), which attempt to bind an owner of a hotel that is not the employer, the Owner does not now nor has it ever conceded that it is the employer legally obligated under the IWA. This has remained the Owner's position since the outset of disputes between the Parties arising from the Hotel's closure. The Owner preserves all available rights and remedies to assert such position at a later time, and submission of this Post-Hearing Brief and the arguments herein are not intended as a waiver of any kind with respect to such position.] Pursuant to the Management Agreement between these parties, Aimbridge has "the exclusive authority and duty to direct, supervise, manage and operate the Hotel" and

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 25 of 51

"shall have the discretion and control in all matters relating to the management and operation of the Hotel."[ Aimbridge has authority and duty to, *inter alia*, (i) recruit, employ, relocate, pay, supervise, and discharge all employees and personnel necessary for the Hotel's operation; (ii) supervise and maintain complete books and records, including without limitation, the books of accounts and accounting procedures of the Hotel; (iii) keep the Hotel and the Furniture, Fixtures, and Equipment in good order, repair and condition, including, without limitation, making necessary replacements, improvements, additions and substitutions to the Hotel; (iv) negotiate and enter into, on behalf of the Owner, service contracts and licenses required in the ordinary course of business in operating the Hotel.]

***The Union's Grievance for "failure to provide requested information" fails to provide sufficient notice of the alleged violation under which it seeks relief.***

Contrary to the Union's claim that the relief sought for the only remaining claim, "failure to provide requested information," is clear from the Hearing Notice, the Union's basis for relief for this broad allegation is far from clear. The Union, of course, is well aware of its right to amend the Hearing Notice, as evidenced by the fact that it did so early on. Yet, despite having every opportunity to do so after the above issues were resolved, the Union failed to amend the Hearing Notice to set forth an actual claim, whether contractual or legal, for which it could now seek relief for the Owner's alleged "failure to provide requested information."

Thus, the Union has failed to give the Owner sufficient notice of any alleged violations to which it must defend. As such, its Grievance should be denied. As set forth below, the Union's anticipated arguments for relief under Article 57 and/or Article 59 of the IWA are meritless because neither article applies to the present circumstances at the Hotel. To the extent the Union alleges a violation of the National Labor Relations Act ("NLRA") related to bargain over the effects of the Hotel, any such claim is similarly meritless.

***The Union has failed to set forth any basis for finding Article 57 and/or Article 59 of the IWA is applicable here and/or has been violated.***

Even assuming, *arguendo*, that the Union's representations to date adequately give notice of alleged violations of Article 57 and/or Article 59 of the IWA, the Union nonetheless failed to demonstrate that either article is applicable here and/or has been violated. Despite the Union's repeated assertion that it has "reason to believe" certain discussions or events have or will occur, it has not presented any evidence to support any of its assertions as to alleged claims or how this otherwise gives rise to any contractual or legal violation.

Notably, the events which give rise to a violation of Article 57 and/or Article 59 are clear and unambiguous from the language therein. Where contract language is unambiguous, it must be interpreted and applied in accordance with such unambiguous terms and provisions. *Am. Fed'n of Television & Radio Artists, AFL-CIO v. Benton & Bowles, Inc.,* 627 F. Supp.

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 26 of 51

682, 685 (S.D.N.Y. 1986) (finding that an "arbitrator is confined to the interpretation and application of the collective bargaining agreement" and "is without authority to disregard or modify plain and unambiguous provisions").

The IWA is not intended to handcuff a hotel owner or police an owner's business decisions or related discussions contemplating potential business decisions. Article 57 is intended to provide monetary relief to employees to prevent the loss of employee benefits that would otherwise follow the permanent loss of employment **resulting from** the conversion of a hotel to residential use. *See* Owner Ex. 3, Art. 57(a) & (b). Article 57 sets forth, in pertinent part:

> (A)  *If,* during the term of this Agreement, a signatory Hotel is converted to residential use . . . the EMPLOYER shall pay to the affected employees, i.e., those who suffer a permanent loss of employment *due to such conversion*, severance under the following terms . . .
>
> (B)  *In the event that* the Hotel's entire premises are affected by the conversion to residential use, then employees eligible for the enhanced severance above shall, *as a condition of receiving such severance payment*, execute a separation document releasing the parties to this Agreement from any liability and future obligations, such as recall rights, under this Agreement.

*See* Owner Ex. 3, Art. 57(a) & (b) (emphasis added).

Neither subsection of Article 57 imposes any obligation on an owner for merely contemplating its options with respect to the property it owns, especially where the bargaining unit members that would be affected, should a conversion occur, have already been terminated *"resulting from the closing of [the] hotel"* for which they were paid Article 52 severance, and not *"due to [a] conversion." Compare* Owner Ex. 3, Art. 52(a) to Owner Ex. 3, Art. 57(a). Even more, Article 57(b) provides that receipt of any payments arising from the conversion is conditioned upon the execution of a separation document releasing the parties to the IWA from any liability and future obligations, including recall rights.

The plain language of Article 57 simply states that *if* a hotel is converted to residential use and *due to* such conversion employees consequently suffer permanent loss of employment, such employees will be compensated *provided that* the parties to the IWA are released from any future obligations. No such situation has occurred here. The Hotel has not been converted to residential use, or any other use. The employees were not terminated *due to* any alleged conversion. The Union does not appear to dispute that the employees were terminated *due to* the permanent closure of the Hotel. No employee has signed a separation document releasing the Owner and/or the Hotel Manager from the obligations under the IWA. In sum, Article 57 simply does not apply here.

As there is presently no claim under Article 57 requiring enhanced severance, there is an obvious disconnect between the Union's purported relief and the purpose of Article 57. The Union's claim that the Owner must pay Article 57 severance as a penalty has no relation to the purpose of

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (646) 992-8103**

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 27 of 51

Article 57 – to compensate employees who are terminated *due to a conversion* of a hotel to residential use. Unlike many similarly situated hotels, the Owner has funded in excess of $12.5 million to compensate employees who were terminated *due to the closure* as required by its Article 52 obligations.

Further, the purported relief for Article 57 enhanced severance as a penalty must be denied pursuant to *The Wagner at the Battery*, IC Decision 2021-31. *See* Owner Ex. 4. In *Wagner*, despite finding a violation of Article 59 of the IWA, this Impartial Chairperson declined to award the Union monetary relief where no harm arose from the violation. Unlike in *Wagner*, here, there is not even an alleged violation of the IWA, let alone an actual violation. Thus, there cannot be harm felt by a violation where one is not alleged and does not exist.

Similarly, the Union failed to set forth a basis for finding that Article 59 is applicable here and/or has been violated. Article 59 is intended to bind a future hotel owner to the same obligations under the IWA as the previous hotel owner. The purpose of Article 59 is to prevent the mass layoffs or loss of employee benefits that would otherwise follow the sale of a Union hotel.

Article 59 sets forth, in pertinent part:

(A)  This Agreement shall be binding upon the successors and assigns of the parties hereto, and no provisions, terms, or obligations herein contained shall be affected, modified, altered, or changed in any respect whatsoever *by the consolidation, merger, sale, transfer, or assignment of either party hereto* or affected, modified, altered or changed in any respect whatsoever *by any change of any kind in the legal status, ownership, or management of either party hereto*. Any successor EMPLOYER shall assume all of the obligations under this Agreement of the prior operator of the hotel . . .

(B)  EMPLOYER shall make it a written material condition of any *transaction* of any kind whatsoever *which transfers majority ownership, management or operational control of the Hotel or Concessionaire* such that the party ("transferee") assuming such majority ownership, management or operational control must assume and be bound in writing to this Agreement.

. . .

(E)  Not less than thirty (30) days *prior to the closing of the transaction*, the EMPLOYER shall give the UNION notice in writing *of the possibility of a transaction* between the EMPLOYER *and the potential transferee* and the notice to the UNION will *provide the details then known to the EMPLOYER as to the nature, expected closing date, and identity of the parties to the transaction*. Not less than ten (10) business days *prior to the closing of the transaction*, the EMPLOYER shall give the UNION notice in writing of the transaction between the EMPLOYER and *the transferee* and the notice to the UNION will *provide the full and complete identity of the transferee, together with a duly executed copy of the pertinent portion of the transaction agreement* between the

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 28 of 51

> EMPLOYER and the transferee pursuant to which the transferee
> agrees to assume this Agreement

*See* Owner Ex. 3, Art. 59(a), (b), & (e). (emphasis added).

The plain language of Article 59 makes clear that a violation of Article 59 arises only where a *transaction* has occurred for the sale, transfer, merger, etc. of the ownership, management, or control of the Hotel. *See* Owner Ex. 3, Art. 59(a), (b), & (e). No such transaction has occurred here. The Hotel has not been sold. It did not merge or become consolidated with another entity. At all times relevant to this Grievance, the ownership, management, and operational control of the Hotel has remained the same, and there is no evidence to the contrary. In fact, the sworn testimony of Dr. Najeeb Samie during the July 7 Hearing further evidences that there have been no changes which would trigger Article 59. Dr. Samie testified that the Owner, which is an entity separate and apart from any affiliated entities, remains the Owner of the Hotel, its Board of Directors retains control and decision making authority regarding the Hotel, and it continues to retain Aimbridge as the Hotel Manager. Notably, the Union does not even argue that any transaction has occurred and without same there is no violation of Article 59 or, as explained below, a violation of the NLRA.

The notice provisions in Article 59 further demonstrate this. Under such provisions, the employer is required to give the Union specified notice of the possibility of and the closing of a *transaction* covered by Article 59. Importantly, those said notices must identify the potential or actual transferee. *See* Owner Ex. 3, Art. 59(e). Those said notice provisions were negotiated by the Union, and yet, the Union has failed to demonstrate why it is entitled to notice beyond that provided in the IWA.

The Union relies on *Wagner* to support its position that it may maintain a claim against the Owner under either of these articles despite no actual, or near actual, transaction or conversion related to the Hotel. Contrary to the Union's claim in its April 16 Letter that the Owner's version of Article 59 is "truncated," the Union's overly broad version of Article 59 and its reliance on this decision is misplaced. *See* Union Ex. S. [Union Exhibits are cited to herein in accordance with the Union's proposed hearing exhibits A through S.] The *Wagner* decision is distinguishable from the instant circumstances because, as the Union admits in its April 16 Letter, Article 59 only applies where there is a *transaction* which transfers majority ownership, management or operational control of the Hotel. In *Wagner*, the owner had *actually* entered into an agreement with the lender granting the lender a security interest in the property. Because an actual transaction had taken place, the parties primarily focused, as the Union does in its April 16 Letter, on the "any transaction whatsoever" language to argue whether a violation of Article 59 occurred following the execution of the lender agreement. Further, the hotel in *Wagner* relied on *Town House 44*, IC Decision 2006-54, where the IC dismissed the Union's grievance where the Union sent a request for information based upon conjecture of a possible sale which the hotel responded to "by stating, 'there has not been, nor is there contemplated any consolidation, merger, sale, transfer or assignment. Therefore, the hotel has no duty under Article 59 to respond.'" While this argument was unsuccessful in *Wagner* where there was an *actual* transaction at issue, here, like in *Town House 44*, there has not been, nor is there

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 29 of 51

contemplated any transaction between the Owner and any other party which now or in the future grants an interest in or transfers majority ownership of the Hotel. The Owner has repeatedly advised the Union of this in writing and verbally, and two witnesses have testified to this under oath. The Union's basis for its information requests and this Grievance is entirely based upon conjecture of a possible sale or conversion.

It is clear that the Owner has not violated either Article 57 or Article 59. The Union has not proffered any basis for finding a violation from the fact that at some unknown time in the future the Owner *may* enter a transaction and a violation *may potentially* arise. Thus, there is presently no dispute or grievance under these articles entitling the Union to any relief, and the Grievance must be denied.

### The Union's Allegation of Failure to Provide Requested Information is Baseless and Ignores Principals of Relevancy and Proportionality

The Union's argument regarding failure to provide information misses the mark. The Owner understands the only ostensible issues to be those regarding a potential sale or transfer or alternate uses of the Hotel and/or ownership. As detailed above, the basis for which the Union seeks relief for this allegation is not clear from the Hearing Notice.

### The Union has failed to set forth any basis for finding a violation of the NLRA.

Even assuming, *arguendo*, that the Union's representations to date sufficiently give notice of an alleged violation of the NLRA related to its rights to bargain over the effects of a sale or transfer or alternate use of the Hotel and/or ownership or control, the Union has failed to meet its burden in establishing such violation. As explained herein, Union has requested information related to a *potential* sale or transfer of the property, ownership or control, or a *potential* alternate use for the Hotel to which the Owner continuously responded that it presently has no plans regarding the future of the Hotel. Contrary to Union President Richard Maroko's claim during the June 21 Hearing, the Union never requested information specifically regarding the thought process and procedures behind any decisions regarding the future of the Hotel.[ To the extent the Union claims otherwise, the Owner hereby objects to such request as over broad, unduly burdensome, disproportionate to the needs of any pending dispute between the Parties, seeking privileged and confidential information, and irrelevant to the Union's stated purposes for requesting information such information.] Thought process and procedures regarding mere contemplations of its options for what to do with a high valued piece of property impacted by a worldwide pandemic are beyond the scope of the Union's information requests and irrelevant to the Union's purported needs, particularly where there is no dispute giving rise to an actual violation of the IWA, an IC order, or law.

While the Owner does not necessarily disagree with the Union that *if* there were a decision regarding the future of the Hotel, such effects bargaining obligations may arise, the Owner contends that until that time, the Union has no right and the Owner has no obligation to bargain over what, how, or when the Owner will decide what to do with its property or otherwise

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 30 of 51

engage in a fishing expedition to investigate any potential claim that may or may not arise in the future. The Union has failed to produce any evidence to suggest that the IWA and/or the NLRA intended to grant the Union such powers over important business decisions, particularly where affected employees were notified of their termination and paid severance and other monetary amounts in accordance with the bargained-for terms of the IWA. For all of the reasons herein, the Union's accusations in its April 16 Letter that the Owner and its counsel are "stonewalling" the Union in its efforts to seek information as collective bargaining agent and that Owner's counsel does "not understand the Union's right under the" NLRA are inaccurate and unsupported by the record developed over the last nine (9) months, including nearly five (5) hours of witness testimony.

Nonetheless, the Owner has complied with its obligations for responding to the Union's information requests. During the June 21 Hearing the Union alleged that since the initial document production in October 2020, the Owner has failed to provide requested information to ten or more information requests by failing to provide a single document. Not only is this a blatant exaggeration of the number of information requests, taking into account their repetitive nature, it also distorts the totality of the facts and circumstances following the October 2020 closure announcement. To be clear, the Owner does not dispute that it has not provided extensive additional documents to the 1,600+ documents produced by Aimbridge and supplemental documents produced by the Owner in response to the Union's October 2020 subpoena. However, the Owner disputes that it was required or able to provide any additional documents in response to the information requests.[ Owner understands the ostensible issues as those related to a potential sale, transfer or alternate uses of the Hotel, ownership or control. To the extent the Union contends otherwise, the Owner reserves it right to respond at such time.] If the Union really wanted, the Owner could have re-produced the same documents in response to the Union's document requests, but that would have been an obvious exercise in futility.

***The Union's allegations that the Owner failed to provide information regarding a potential sale or transfer or alternate use of the Hotel disregards the Parties' prior understanding and Impartial Chairperson Shriftman's verbal order.***

The Owner has complied not only with the Union's requests, but with this Impartial Chairperson's verbal directive on November 5, 2020 (the "November Hearing"),[ The Union requested this hearing on an emergency basis for, *inter alia*, and the Owner's alleged "failure to provide information." This request came less than 24-hours after the Union sent its November 1 Letter to Owner's counsel alleging that Owner's timely October 30 Response to the Union's October 9 Subpoena failed to fully respond.] by advising the Union in writing that it presently has no such plans and does not have responsive information. *See* Owner Ex. 5, Owner Chart Aid to July 7 Hearing. The mere fact that each of the Owner's responses was not accompanied by documents does not evidence a failure to provide requested information. The Union has failed to prove otherwise.

Since October 2020, the Union has sent approximately nine requests for information to the Owner and/or the Hotel Manager. The Owner has complied with its obligations for responding to such information requests related to

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 31 of 51

a potential sale or transfer or alternate use of the Hotel, despite nearly half of them requesting near identical information as earlier information requests which the Owner had already sufficiently responded to.

- On October 9, November 1, and November 12, 2020, and January 28, 2021, the Union requested, *inter alia*, a description of the potential uses to which the Hotel may be put and documents and/or communications regarding alternate uses, or a potential sale or transfer. *See* Union Exs. B, F, I, L. Union's November 12 Letter, in accordance with the November Hearing, added "*[m]ost importantly*, the Union separately asks the Owner to advise in writing whether it has any plan(s) for uses of the Hotel post-closing and to provide any existing information related to the same" and "to advise in writing whether it has any plan(s) regarding a sale or transfer of the Hotel." Union Ex. I (emphasis in original).

- On October 30, November 12, and November 19, 2020, and February 9, 2021, Owner responded to the Union's information requests, respectively. *See* Union Exs. D, H, J, M.

The Owner's October 30 Response sufficiently responded to the Union's October 9 Subpoena by, *inter alia*, objecting for lack of present dispute regarding the *potential* future use or a *potential* sale or transfer of the Hotel, and requesting the Union make a proffer as to a suspected violation. *See* Union Ex. D. The Owner's objections therein are completely proper in this instance given that the Owner communicated to the Union, employees, and third parties that the Hotel's closure was permanent due to economic reasons and in no way indicated a potential sale or transfer or alternate use of the Hotel was at issue.[ In fact, the Owner first advised the Union of the inapplicability of enhanced severance under Article 57 of the IWA in its October 4, 2020 letter notifying the Union of the permanent closure. *See* Union Ex. A.] The Union has failed to show otherwise, either through its November 1 Letter or any other evidence.

In its November 1 Letter, the Union purported that such information was relevant to the Hotel's bargaining or negotiation requirements regarding the impact or effects of the Hotel's closure and alternate future uses and with respect to the payment of contractual severance, to which the Union cited Article 57 *as an example*, without otherwise proffering a suspected violation.[ As explained *supra*, the Union has failed to support any alleged NLRA violations related to effects bargaining. ] Then, without providing the Owner any opportunity to respond or engaging in any discussions to bargain or negotiate, the Union requested the November Hearing for, *inter alia*, the Owner's alleged "failure to provide requested information," arguing that it needed to know whether the Owner had any plans for the building for purposes of discussing any impacts, thereby demanding that the Owner provide more than a verbal response that it had no responsive documents in its possession by, instead, advising in writing whether it had any plans for the future of the Hotel. This Impartial Chairperson verbally directed the Owner to respond as such. Accordingly, the Owner complied, as evidenced by its November 12 and November 19 Responses, by advising the Union in writing that it did not have documents responsive to such requests and offering the Union an opportunity to submit a written request and propose dates for the Parties to meet and discuss the effects of the Hotel's closure and subsequently advising that it did not presently have plans for alternative uses or to sell or transfer the Hotel. *See* Union Exs. H, J.

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 32 of 51

Thereafter, the Owner's understanding remained, and the Union's November 23, 2020 Letter confirmed, that all Parties agreed that the Owner's written response, per the Union's request and the order, was sufficient, and only "should the Owner's current plans regarding the hotel change in the future, [will the Union] expect the Owner to advise the Union and provide such related information immediately." *See* Union Ex. K.

Despite no indication by the Owner that it would not comply with the above if its plans changed, the Union requested such information again, almost verbatim, in its January 28 Letter because it learned through "various press reports" of "a potential sale or transfer of ownership" of the Hotel. Without alleging any violations of the IWA, the Union merely "remind[ed]" the Owner of its Article 59 obligations, to which the Owner's February 9 Response, in accordance with the Parties' earlier understanding, advised in writing that there had been no transaction which would give rise to Article 57 or Article 59 and thereby revived its earlier objections regarding the Union's failure to proffer a suspected violation. *See* Union Exs. L, M.

Without any new basis for doing so, the Union again requested information relating to alternate uses or a sale or transfer of the Hotel. This time, however, the Union, without justification, broadened the scope of its requests.

- March 22, 2021: Union requested information relating to "any plans or discussions" regarding "any alternate uses" or "any sale or transfer or change in control of the Hotel" and requesting that the Hotel advise in writing if it has no responsive information or documents to this request.[ As explained above, this request for the Owner to advise in writing if it has no responsive documents to the request is contrary to the position set forth by the Union during the November Hearing. As such, the Owner responded to the requests within the Union's March 22 Letter and March 30 Letter in accordance with this Impartial Chairperson's verbal order and the Parties' understanding. As there have been no changes in the Owner's plans for the Hotel since that time, there is no reason why such responses are insufficient, and the Union has failed to prove otherwise.] *See* Union Ex. N.

- March 31, 2021: Owner responded in accordance with the Parties' earlier understanding that the Owner was required to advise in writing of its plans for the future of the Hotel, by again advising that it presently had no such plans. *See* Union Ex. P.

On March 30, 2021, the Union, for the first time, set forth the "potential claims" for which it was seeking information–Article 59 and/or Article 65 of the IWA–presumably in light of this Impartial Chairperson's March 10, 2021 decision in *Wagner*, IC Decision 2020-31, which as detailed herein, is distinguishable from the instant circumstances.[ The Union's April 16 Letter confirms that this is the Union's basis for believing there may be a "potential claim[]" under Article 59. As explained herein, the *Wagner* decision is distinguishable, and Article 59 is neither applicable nor has there been a violation.] *See* Union Ex. O. On April 15, 2021 the Owner responded again advising in writing that no transaction existed giving rise to Article 59 (or Article 65), that it presently had no plans to transfer, directly or indirectly, ownership, possession or control of the Hotel, and

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 33 of 51

that it did not have any information or documents responsive to this request. *See* Union Ex. R.

In sum, as of the date of this Post-Hearing Brief, the Owner has advised the Union in writing on approximately five (5) occasions, verbally on multiple occasions, and has produced two witnesses to testify under oath that there are presently no plans regarding the future use of the Hotel, or a sale or transfer of ownership or the property. There are only so many times that the Owner can provide this information. The Owner has never indicated that it would not comply with the Union's November 23 Letter and advise the Union if its plans change in the future as the Owner acknowledges that it may be obligated to do so under certain provisions of the IWA. The simple fact is that the Owner's plans for the future of the Hotel have not changed since that time. For these reasons, that the Union is now seeking to change its position and demand production of documents, as opposed to the compliant written responses already provided, is unnecessary and disproportionate to the needs of the Union, unduly burdensome, and inappropriate.[ f the Union is looking for yet another confirmation that a transaction to sell or transfer, or regarding the future use of the Hotel is not imminent and that in the event its plans for the future of the Hotel change, the Owner will comply with its obligations under the IWA, including Article 57 and Article 59, the Owner will stipulate to such on the record. Accordingly, the Owner hereby concedes, stipulates, and agrees that it understands its obligations under the IWA, and in the event that the Owner's plans for the future of the Hotel change giving rise to its obligations under Article 57, Article 59, or any other provision of the IWA, the Owner will comply with all such obligations.]

### The Union's allegations that the Owner has failed to provide information regarding the ownership and/or decisionmakers of the Hotel is inaccurate as the Owner and/or Aimbridge did provide responsive information on October 13, 2020 and February 9, 2021.

Similarly, the Union has alleged that the Owner has failed to provide any information in response to its requests about the ownership and decisionmakers of the Hotel. Again, the Owner does not dispute the Union's claim that the Owner has not provided extensive additional documents to the 1,600+ documents produced by Aimbridge and the supplemental documents produced by the Owner in response to the Union's October 2020 subpoena. However, the Owner does dispute that the Union was never provided with such information. The Owner objected to the requests on the basis that, among other things, the requests were disproportionate to the needs of any pending disputes with the Union and noted that the Union was already in possession of any responsive documents to which the Owner was aware. *See* Union Ex. R. That is a completely proper objection in this instance. The Union has never established otherwise.

During the July 7 and July 8 Hearings, the Union spent hours questioning the two witnesses who appeared to testify–Dr. Najeeb Samie and Mr. Faisal Abdul Ghaffar–about the ownership structure and relationship between the various entities, claiming that it had not received any information regarding such. This is simply not true. In fact, the corporate structure of the Owner and affiliated entities is clear from the first pages of Aimbridge's 1,600+ document production produced to the Union on October

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 34 of 51

13, 2020 in response to the Union's October 9 Subpoena. *See* Owner Ex. 1, at AIM000002, AIM000015, AIM000037. Further, the Owner provided a written response detailing the various entities and the ownership of the Hotel on February 9, 2021 in response to the Union's January 28, 2021 information request. *See* Union Ex. M. It was not until March 30, 2021 that the Union specifically requested documents like operating agreements, articles of incorporation, or partnership agreements, that identifies this information, which the Owner objected to on April 15, 2021 on the grounds that such request was disproportionate to the needs of any pending dispute and requesting that the Union make a proffer as to the suspected violation of the IWA. Notwithstanding, the Owner advised in writing, again, of the entity that is the sole member of RHC Operating LLC. *See* Union Ex. R. In the Union's April 16 Letter, it claimed that such information was necessary for the Union to investigate "what related and affiliated entities of the Owner exist that may be bound to the terms of the IWA." *See* Union Ex. S. However, as the Owner has produced information identifying the corporate structure of the various entities, including two witnesses who provided extensive sworn testimony on the subject, and advised the Union on numerous occasions, in writing and verbally under oath, that there are no plans to transfer ownership or control of the Hotel, the record does not support a finding that there is a pending dispute regarding the ownership of the Hotel. As such, a request for operating agreements, articles of incorporation, and the like is beyond the needs of the Union and there is no reason why the information already provided to the Union is insufficient for the Union's stated purpose.

Further, with regard to the decisionmakers, the Owner has since supplemented its responses to the Union by providing the Union with the Owner's response to the Fund's information request, which provides the names of the Owner's directors and officers. *See* Owner Ex. 5.

***The Union's specific examples of the Owner's alleged failure to provide information, first alleged in Union counsel's July 13, 2021 email to Owner's counsel, fails to bolster the Union's position***

The Owner addresses each of the alleged "examples of the Hotel's failure to comply with the information requested" individually below.[ The Union's alleged examples are quoted in bold font at the beginning of each specific example.] *See* Owner Ex. 6.

### *Deloitte Report*

**"The Hotel had commissioned a study by Deloitte regarding future uses of the Hotel which was completed in late 2019 and which the hotel has failed and refused to turn over"**

During the July 7 and July 8 Hearings, the Union questioned the two witnesses about a study and subsequent report conducted by Deloitte regarding the Hotel. The witnesses did not deny the existence of such report or its contents. However, this allegation not only fails to state any alleged violation of the IWA or the law, but is also inaccurate.

That the study was completed in late 2019 is clearly false. The Deloitte report contains the following dates: the "Effective Date" or "Valuation Date" of April 1, 2019 and the "Date of Report" of July 18, 2019. *See* Owner Ex. 7. Further, the Union has failed to provide a basis for its

Case 1:21-cv-10349-JGK    Document 7-2    Filed 12/03/21    Page 36 of 52

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 35 of 51

need for this document and why it should have been produced to the Union. As the Deloitte report notes, the scenarios presented therein are *theoretical and highly speculative in nature* and based on the market value of the Hotel property *as of the Valuation Dates*, i.e., April 1, 2019. *See* Owner Ex. 7, pp. 4, 6, 10. In other words, the relevant period for purposes of Deloitte's study was nearly a year before the Coronavirus pandemic's devastating impact on the Hotel even began. Thus, it is unclear, and the Union has failed to set forth any basis, for why a report based on the state of the Hotel property and operations a year prior to the worldwide pandemic's massive shutdowns and travel bans, directly impacting the hotel industry, is relevant to discussions about the future of the Hotel *post*-pandemic, where the financial conditions of the Hotel have undoubtably changed.

***Board of Directors' Meeting Minutes***

  **"All three corporate entities, RHC Operating LLC, RHC N.V., and PIA Investments have Board of Directors meetings at which minutes are taken. Yet, in your last e-mail to us, you refuse to turn over such documents and want the Impartial Chairperson and the Union to accept your representation that none of the minutes are responsive to the Union's request for information."**

  The Owner does not dispute that RHC Operating LLC, RHC N.V., and PIA Investments have Board of Directors meetings which are memorialized in minutes. The Owner does dispute, however, that the production of such minutes to the Union is relevant or necessary.

  The discussions at these Board meetings, memorialized in the minutes, contain sensitive, confidential, and privileged information. It is reasonable that a company wish to refrain from producing such documents where they do not contain information relevant to information requests for the Union or otherwise. As previously stated, Owner's counsel has reviewed the minutes from Board meetings from the past six months and offered to attest under penalty of perjury that this review shows nothing is memorialized therein regarding the future use, sale or transfer of the Hotel. The Union has failed to demonstrate why this is insufficient to satisfy the Union's stated purpose for any minutes.[ To the extent the Union or the Impartial Chairperson requests further confirmation, the Owner will proffer to produce such Board minutes only to the Impartial Chairperson for in-camera inspection of such records.]

***Dr. Samie Presentation to Government Committee***

  **"Dr. Sammie gave a presentation to a government committee in Pakistan regarding the Roosevelt Hotel. Yet no such document was turned over."**

  The Owner does not dispute that Dr. Samie gave a presentation to a government committee in Pakistan. However, as Dr. Samie testified, he did not give a presentation on the entirety of the Hotel, but rather on the financial needs of the Hotel at that time. The Union's theory for this line of questioning, like many of its other theories, was based on a news report published in the *Business Recorder*. Upon reviewing the article, Dr. Samie testified that he was not familiar with this article, but that the information reported therein, including the references to his presentation to the committee, were "cut and paste" from different events that have taken place over the last year. At no time during Dr. Samie's testimony did he

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (646) 992-8103**

Case 1:21-cv-10349-JGK   Document 7-2   Filed 12/03/21   Page 37 of 52

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 36 of 51

state or otherwise indicate that he presented any document to the government committee to which he appeared regarding any transaction to sell, transfer, or repurpose the property. In fact, Dr. Samie testified under oath that he did not discuss possible future uses of the Hotel at any point during his presentation to the committee. Thus, any such documents provided to the government committee are neither responsive to the Union's information requests nor relevant to any pending dispute or alleged violation.

***Loan Documents***

"**The Hotel filed paperwork to obtain a $142 million dollar loan from the National Bank Pakistan for the Roosevelt Hotel and the Hotel would have us believe there was no mention in such paper work how the Hotel would re-pay the loan, i.e. future uses. No such documentation was turned over.**"

As indicated during the July 7 and 8 Hearings, Owner's current labor counsel was not involved in obtaining and securing the $142 million loan from the National Bank of Pakistan ("NBP"). Despite the two witnesses' testimony under oath that there is no relevant information for the Union's purposes within the relevant loan documents, Owner's labor counsel nonetheless conferred with Owner's counsel involved in this process to address the Union's concerns. A cursory review of the December 14, 2020 loan agreement reveals the following:

- Most of the proceeds were used to refinance an October 2020 NBP finance facility, which refinanced existing debt and paid severance to hotel employees. The additional funds were allocated to pay outstanding trade payables, closing costs for the loan, and earmarked for future advances for withdrawal liability, and trade payables (both prior to and after closure);

- No provisions addressing specific future use of the property after closing; no appraisal of the Hotel property; several provisions relate to cessation of hotel operations;

- Customary representations and covenants covering maintenance of the property, divided into two groups: (i) while the property was being operated as a hotel and (ii) after cessation of hotel operations. The hotel-related provisions include, *inter alia*, that property be used as a hotel and Owner not enter into any line of business other than ownership and operation of the property, taking into account specific carve-out for cessation of hotel operations on December 20, 2020 or upon prior notice to Lender; maintain licenses necessary for operation as hotel while operates as such; and Lender has opportunity to review and consent to changes to Management Agreement upon cessation of hotel operations.

To the extent the Union maintains that the above, combined with the witnesses' testimony, is insufficient, the Owner reserves the right to submit a reply at such time.

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY  10036**
**TEL: (212) 541-7212  FAX: (646) 992-8103**

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 37 of 51

***The Union's Allegation Regarding Mr. Abdul Ghaffar's Location Around June 17 or June 18 is Irrelevant as The Owner's Request for an Adjournment of the June 21, 2021 Hearing was Entirely Unrelated to the Witnesses' Whereabouts.***

The Union has not articulated how this amounts to a purported violation of the IWA or the law, and the Owner will not speculate as to a suspected or alleged violation. Further, this is not an accurate recitation of the facts. The Owner's request for an adjournment was for purposes of having sufficient time to review relevant information and prepare for the hearing. As the hearing was to take place via Zoom, the physical location of the witnesses during the hearing was irrelevant and not further discussed after the June 10, 2021 hearing.

On June 1, 2021, the Union subpoenaed three witnesses to testify *via Zoom* at a hearing before the IC on June 10, 2021. The Owner submitted a motion to quash the subpoenas for various reasons articulated in its filing dated June 9, 2021. The Impartial Chairperson decided to withhold ruling on the motion, and left it to the Parties to come to a mutual agreement. The Parties subsequently agreed that two of the three subpoenaed witnesses would appear to testify *via Zoom* at a mutually agreeable time. The initial adjournment date for the hearing was June 21, 2021. On June 18, 2021 counsel for both Parties met with the Impartial Chairperson in response to the Owner's request for an adjournment of the June 21 Hearing. The Impartial Chairperson ordered that the hearing would continue as scheduled on June 21, but only for a brief hearing of abbreviated presentations of the Parties' arguments followed by an order requiring the witnesses to appear at a set date for full testimony on July 7, 2021. Both Dr. Samie and Mr. Abdul Ghaffar appeared and testified on July 7 and July 8 for approximately more than five (5) hours. The Union cannot reasonably claim that it has been deprived of the opportunity examine the Owner's witnesses.

During the June 18 meeting with counsel and the June 21 Hearing, Owner's counsel clearly explained that an adjournment was necessary to allow the witnesses sufficient and reasonable time to prepare and consult with counsel in light of the abundance of information produced to the Union, the overbroad scope of the subpoenas, and the time difference between the witnesses and counsel. As noted in the subpoenas and during the June 10 Hearing, the witnesses were to appear *via Zoom*—which the Union emphasized in response to the Owner's motion to quash the subpoenas. Thus, because the physical location of a witness appearing via Zoom is irrelevant, the witnesses did not inform, and counsel did not inquire or otherwise represent, as to where they would physically be located during the week of June 17 or 18. Rather, counsel conferred with the Owner to discuss the time necessary to review the Union's allegations in connection with the information produced thus far and prepare for the hearing and represented such to the Union and Impartial Chairperson in support of its request for an adjournment.

As the Union has set forth only a faulty iteration of the facts, and has failed to allege any violation of the IWA or the law resulting from the witness's trip to New York City and the Owner's request for an adjournment of the witnesses' appearance and testimony for legitimate reasons, the Union's grievance as to this allegation must be denied.

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

### Conclusion

The Owner's position is relatively simple. There is presently no pending dispute or claim of any violations of the IWA, any IC orders, and/or law. There are presently no plans to sell, transfer, or convert the Hotel property. As required under the IWA, if such plans change, the Owner intends to notify the Union accordingly and engage in such related discussions.

For all of the foregoing reasons, the Union's Grievance should be denied in its entirety.

Owner RHC Operating LLC [Roosevelt Hotel Corporation, N.V. ("RHC N.V."), a Netherlands Antilles company, is the sole member of RHC Operating LLC, which owns and holds the title of the Roosevelt Hotel. *See* Owner Ex. 1, at AIM000002, AIM000015, AIM000037.] (the "Owner" or "RHC LLC"), through its undersigned counsel, Venable LLP, respectfully submits this Reply Brief in response to the post-hearing brief filed by the New York Hotel & Motel Trades Council, AFL-CIO (the "Union") (together with the Owner, the "Parties") in support of its grievance, U20-260 (the "Grievance"), regarding the Roosevelt Hotel (the "Hotel").

The Union's brief mischaracterizes the evidence before the Impartial Chairperson ("IC") and fails to support the Union's unfounded claims. In short, the Union has failed to meet its burden to offer sufficient evidence for the IC to find any contractual or legal basis for issuing an order granting the relief sought by the Union. Simply put, the evidence before the IC does not demonstrate any violation by the Owner of the Industry-Wide Agreement (the "IWA"), an order of the IC, and/or the National Labor Relations Act ("NLRA").

Given that the Union has failed to provide any reasonable basis for the IC to rule in the Union's favor, the Owner respectfully requests that the IC dismiss the Grievance in its entirety.

### INTRODUCTION

In its post-hearing brief, the Owner detailed how the Union has failed to allege or support any basis upon which the Union seeks relief or is entitled to relief. The Union baselessly urges this Impartial Chairperson to find that "the Hotel violated its obligations under the IWA and the National Labor Relations Act [] by failing and refusing to provide the Union with the information requested in the [requests for information]." Union Br., p. 2. According to the Union, the relevant articles of the IWA in this case are Article 26, Article 57, and Article 59. Union Br., p. 3. Yet, the Union's brief is silent as to any violations of these articles and the evidence only further supports a finding that there has been no violation.

The Union attempts to justify its baseless claim that the Owner violated the IWA by requesting that the Impartial Chairperson issue an award which "draw[s] an adverse inference that the Hotel is hiding information from the Union regarding its post-closure use of the Hotel in order to avoid the Union enforcing IWA Article 57 which requires the Hotel to pay additional severance pay." Union Br., p. 23. The Union fails to note though that Article 57 requires said additional severance pay only where employees are laid off as a result of a conversion of the hotel, in whole or part, to residential use, and points to no objective evidence for its belief that

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 39 of 51

"the Hotel is hiding information . . . to avoid the Union enforcing IWA Article 57." *Id.*

As further detailed herein, the Union bases its arguments on mischaracterizations of the evidence and conveniently omits certain relevant information. This is consistent with the Union's now-10-month scheme of baseless hearings and requests for information solely as an attempt to confuse and complicate a relatively straightforward issue. The Union's intent – to pressure the Owner, whose business has been significantly impacted by the Covid-19 pandemic, to pay additional money which it is not otherwise obligated to pay – has been clear from the start and is only further emphasized by its post-hearing brief and the evidence.

The Union's claim that the Owner has violated the NLRA by not producing any documents or communications in response to its requests for information regarding a potential sale or transfer or conversion of the Hotel is similarly meritless. The Union's assertion that it is entitled to information concerning a potential sale or transfer or conversion "to prepare for impact a/k/a effects bargaining" entirely overlooks that there has been no *decision* and thus no effects of any such decision in which the Owner is required to bargain. The Union has failed to demonstrate through objective evidence the relevancy of the information and documents it has requested or support its claim that it is entitled to information where a decision has not yet been made.

### RESPONSE TO UNION'S POST-HEARING BRIEF

### *The Union Incorrectly Conflates the Various Players Involved in This Matter.*

As a preliminary matter, the Union incorrectly uses the "Roosevelt Hotel" or the "Hotel" throughout its post-hearing brief, as it did in its hearing notices and requests for information, to collectively refer to the Owner; the employer and manager of the Hotel, Aimbridge Hospitality [Previously Interstate Hotels LLC, which merged with Aimbridge Hospitality in 2019. As used throughout, the defined terms "Employer" and "Aimbridge" include Interstate Hotels LLC.] ("Aimbridge" or "Employer"); and the building/property located at 45 East 45th Street, New York, New York 10017 (hereinabove defined as the Hotel). Rather than being referred to as one collective party, the Owner, the Employer, and the Hotel must be considered and recognized as distinct from one another to avoid confusion and mischaracterizations as to the separate roles, duties, and obligations each one has. For example, the Employer, not the Owner, has control over matters related to the management and operation of the Hotel, including, as the sole employer of all employees at the Hotel, and all employee-related matters.

This is particularly so where the Union has failed to present any support for – or even address – its assertion that the "Hotel" is bound to the IWA. Union Br., p. 3. Throughout the course of disputes between the Owner and the Union, and in its post-hearing brief, the Owner has repeatedly asserted its position that it is not the employer bound by the terms of the IWA.[ The Owner acknowledges that the signatory parties to the IWA are the Union and the Hotel Association of New York City, Inc. ("Hotel Association"), which acts as the representative of its members. As stated in its post-hearing brief, the Owner also acknowledges the definition of "employer" under the IWA and certain articles, such as Article 59(D), which attempt to bind an owner of a hotel that is not the employer. However, the

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (646) 992-8103**

Owner does not now nor has it ever conceded that it is the employer legally obligated under the IWA or that it is otherwise bound by the terms and conditions therein. This has remained the Owner's position since the outset of disputes between the Parties arising from the Hotel's closure. Should this issue not be decided at this time or otherwise require further briefing, the Owner preserves all available rights and remedies to assert such position at a later time, and submission of this Reply Brief or the Owner's post-hearing brief and the arguments therein are not intended as a waiver of any kind with respect to such position.] Relatedly, the Union fails to set forth any basis for finding the Owner liable under the NLRA. Despite collectively referring to Aimbridge, the Owner, and the building as "the Hotel," only one of these parties is the employer – Aimbridge. The Union's brief clarifies that its NLRA claim arises under Section 8(a)(5) which provides that it's an unfair labor practice for an "*employer . . .* to refuse to bargain collectively with the representatives of *his* employees." N.L.R.A, 29 U.S.C. § 158(a)(1)(5) (emphasis added). Notably, the Union's claim does not arise under Section 8(a)(1), which may extend liability to an entity that is not the employer of the employees subject of the dispute. Indeed, the NLRB has acknowledged this distinction between Section 8(a)(5) and Section (8)(a)(1). *See New York, New York Hotel & Casino*, 356 N.L.R.B. 907, 911 (2011) ("The prohibition [in 8(a)(1)] is not limited to interference with the rights of his employees. In contrast, the prohibition in Section 8(a)(5) is so limited, providing that it is an unfair labor practice for an employer 'to refuse to bargain collectively with the representatives of his employees.'") (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")). As the Union has now clarified the NLRA section it bases its claim on and has failed to demonstrate – or even address – the Owner's assertion that it is not the employer, the Union has not even addressed its preliminary burden of showing how the Owner is a liable party under the IWA or the NLRA.

As such, the Union's Grievance should be dismissed on this alone. However, even assuming the Owner may be considered a party that can be liable under the IWA or the NLRA, the Union has nonetheless failed to meet its burden on the merits and as further detailed below and in the Owner's post-hearing brief, its Grievance must be denied in the entirety.

**The Union's Post-Hearing Brief is Replete with False Statements and Mischaracterizations.**

To start, the number of false statements and mischaracterizations of the evidence throughout the Union's brief is astonishing. These include, among others:

- The Union cites to the Owner's October 4, 2020 letter notifying the Union of the Hotel's permanent closure and states "[s]uch letter also included an unsolicited comment from the Hotel that the IWA Article 57 had not yet been triggered." Union Br., p. 4. The Owner's claim that Article 57 was inapplicable was far from "unsolicited." Rather, it was in response to Union General Counsel Amy Bokerman's unsolicited

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 41 of 51

calculation of Article 57 severance payments sent to Aimbridge employees on October 1, 2020. Owner Ex. 8.

- The Union claims that, contemporaneous with the announcement of the Hotel's closure, "news reports indicated that the Hotel *would be* renovated and converted for residential and commercial use" and cites to three news articles submitted as exhibits during the hearings. Union Br., p. 4 (emphasis added). A simple reading of these articles shows this is false. While these articles indicate that there *may* have been some *potential* options for the Hotel being considered in the past, that the government was "hoping" to sell or convert the property, or that it "seems likely to convert," none of these articles state that the Hotel *would be* renovated and converted. *See* Union Exs. T-V. In fact, one article, quoting the Pakistan Aviation Minister, states that "the chatter" about a sale or conversion is "misleading" and "speculative" and confirms that there are no plans for the Hotel. This was underscored by Dr. Najeeb Samie's testimony about the lack of context and "cut and paste" nature of news reports on the Hotel.

- The Union mischaracterizes or conveniently omits information regarding the Union's requests for information, the Owner's responses, and the November 5, 2020 hearing before Impartial Chairperson Shriftman. The Union claims that the Owner failed to comply with the Union's October 9 and October 21 subpoenas (collectively, "Subpoenas"), its subsequent requests for information, and the IC's directive at the November 5 hearing by failing to produce any documents. The Union fails to mention that the IC's directive included that if the Owner's response was that it has no plans regarding a potential sale, transfer, or conversion of the Hotel, to advise the Union of this in writing – something the Union acknowledges in its November 11, 2020 letter (Union Ex. G) and the Owner complied with, as the Union admits, by advising the Union in writing on November 19, 2020 that it had no plans to sell, transfer, or convert the Hotel. Union Br., p. 6. The Union omits relevant language from its November 12, November 23, January 28, March 22, and March 30 letters which either request that the Owner advise in writing whether it has any plans for uses of the Hotel post-closing or regarding a sale or transfer of the Hotel or that the Owner advise in writing if it has no information or documents responsive to the Union's requests. The Owner complied with such requests on November 19, February 9, March 31, and April 15. Union Exs., D, H, J, M, P, R.

- The Union incorrectly states that the IC denied the Owner's June 9, 2021 motion to quash the Union's June 1, 2021 subpoenas compelling Dr. Samie and Mr. Faisal Abdul Ghaffer to testify. Although the IC did direct that the witnesses were to appear and testify, the IC declined to rule on the Owner's motion and requested that the Parties mutually agree when the witnesses would appear.

- The Union mischaracterizes the Owner's request for an adjournment of the June 21, 2021 hearing in which Dr. Samie and Mr. Abdul Ghaffer were scheduled to testify. The Union entirely overlooks that the basis for the Owner's adjournment, which was discussed between the Parties

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 42 of 51

and this Impartial Chairperson during a June 18, 2021 call, was the need for additional time to prepare.

- The Union's recitation of Dr. Samie's and Mr. Abdul Ghaffar's testimony is full of mischaracterizations and misstatements. Contrary to the Union's statements in its brief:
  - Dr. Samie explicitly testified that he was *not* the Chairperson of RHC LLC. Union Br., p. 10.
  - Dr. Samie did not testify that he is the President of PIA. Union Br., p. 10. He testified that he is the President of RHC LLC, a board member of PIA, and the prior managing director of PIA. Similarly, Mr. Abdul Ghaffar testified that he is Director of Finance of PIA, not RHC LLC, and Executive Vice President of RHC LLC, not PIA. Union Br., p. 11.
  - Dr. Samie did not testify that "PIA played a large role in decisions affecting the Hotel." Union Br., p. 10. While Dr. Samie testified that PIA logically would be concerned about the assets of RHC LLC given that PIA's subsidiary, RHC N.V., is the sole member of RHC LLC, he also testified that each entity has its own board of directors and that PIA had no involvement in the decision to close the Hotel.
  - The Union's claims that "Dr. Samie was involved in such decisions as the Managing Director of PIA" and that Mr. Abdul Ghaffer could not explain why his communications with Aimbridge "was in his role as PIA officer and not as an RHC officer" are a perfect example of the Union's mischaracterization of their testimony. Dr. Samie testified that he was not communicating with Aimbridge in both his PIA role and RHC LLC role and explained that the PIA email address was used because Dr. Samie wears "two hats" and uses that email address because PIA's office is in Pakistan where he primarily does business, whereas RHC LLC is New York-based. Similarly, Mr. Abdul Ghaffar never testified that he was acting in his role as a PIA officer in such communications with Aimbridge.
  - Dr. Samie explicitly testified that his presentation to Pakistan's Aviation Division was limited to the financial needs of the Hotel, not on the Hotel generally. Union Br., p. 10.
  - Dr. Samie never testified that the Aviation Division regulated the Hotel. Union Br., p. 11.
  - The Union's claim that Dr. Samie "could not explain why the [Deloitte Report] was not turned over to the Union" fails to acknowledge that Dr. Samie first stated that he believed the reason to be that the Union's requests were limited to a certain time frame. Union Br., p. 11. It was only after Union counsel showed Dr. Samie one of the Union's two information requests that unreasonably requests any and all documents or communications without limitation as to time that Dr. Samie indicated he did not have details regarding production of this document. Indeed, with the exception of these two information requests, the Union's information requests were in fact limited in temporal scope. *See, e.g.*, Union Ex. F ("within the past year"); Union Ex. L ("within the past six (6) months").

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 43 of 51

o The Union's claim that Mr. Abdul Ghaffar could not recall whether the various entities followed consolidated financial statements fails to mention that Mr. Abdul Ghaffar could recall and testified to PIA's annual financial statements as they relate to the Hotel and PIA's loans to RHC LLC. Union Br., p. 11.

o Contrary to the Union's assertion that the witnesses' testimony was "evasive and inconsistent with regard to which entity or entities own and control the Hotel; who were the decision makers regarding the same; what possible future uses of the Hotel were being considered and how the Hotel was able to obtain a $142 million dollar loan without providing any reliable proof that it would be able to repay the same," the witnesses' nearly five hour testimony was consistent in regards to all of these topics and the Union fails to support its claim that such testimony was "evasive."

**The Union has failed to support its claim that the Owner has violated Section 8(a)(5) of the NLRA.**

The Union's post-hearing brief attempts to mask its real goal – engaging in decisional bargaining despite having no contractual or legal right to do so – by framing its position as a right to "effects bargaining." The Union's argument that the Owner violated the NLRA by failing to provide documents or communications regarding a potential sale, transfer, or conversion of the Hotel must fail because there has been no *decision* made that gives rise to any effects, actual or potential, over which the Union may be entitled to bargain over. The record does not support a finding that a decision has been made as to the future of the Hotel and the Union has failed to demonstrate that it is entitled to any and all documents and communications related to potential alternate uses and/or sale or transfer of the Hotel before any actual decision is made.

**The Union has failed to establish the relevancy of its requests for information concerning a potential sale, transfer, or conversion of the Hotel.**

As a preliminary matter, the Union has not established the relevancy of the information requested as it relates to a *potential* sale, transfer, or conversion of the Hotel where the record does not demonstrate that a decision has been made. The Union here was required to first demonstrate that the requested information was relevant because it is not entitled to a presumption of relevance as decisions regarding whether to sell, transfer, or convert the Hotel are not so intrinsic to the Union's collective-bargaining duties as to make it presumptively relevant. *NLRB v. George Koch Sons*, 950 F.2d 1324, 1331 (7th Cir. 1991); *San Diego Newspaper Guild Local 95 v. NLRB*, 548 F.2d 863, 867 (9th Cir. 1977) ("Conversely, when the Union requests information which is not ordinarily pertinent to its performance as a bargaining representative, but which is alleged to have become so because of peculiar circumstances, the courts have required a showing of relevance by the Union before holding that the employer must comply with the request."). The Union has failed to satisfy its burden as the record contains no objective factual basis in support of the Union's suspicion that a sale, transfer, or conversion of the Hotel or ownership has or will occur.

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 44 of 51

*Shoppers Food Warehouse Corp.*, 315 N.L.R.B. 258, 259 (1994) ("A union has satisfied its burden when it demonstrates a reasonable belief supported by objective evidence for requesting the information."); *Bohemia, Inc.*, 272 N.L.R.B. 1128, 1129 (1984).

The Union does not have unlimited power to "investigate" potential contract violations without producing any objective evidence and suspicion alone is insufficient to satisfy the burden. *G4S Secure Sols. (USA), Inc.*, 369 N.L.R.B. No. 7, at *2 (Jan. 9, 2020). The mere existence of a document which the Union subjectively believes must contain relevant information is insufficient to establish objective evidence of relevancy. *Id.* (finding union failed to establish the relevancy of the contract it requested where the union's "request was aimed at determining whether the contract contained relevant information," but the union failed to "show an objective factual basis for believing that the contract contained such information").

Here, the Union has failed to show a reasonable belief supported by objective evidence for requesting the information concerning a potential sale, transfer, or conversion.  First, unions do not have the broad right to seek any and all information related to an entity's decisions, such as their decision-making process, as Union's counsel suggests. As detailed below, the Union has failed to demonstrate that it has the right to bargain over the decision itself, and has thus failed to demonstrate that information concerning "discussions" about whether to *potentially* sell, transfer, or convert is relevant.

Nor has the Union demonstrated an objective basis for believing that the Deloitte Report, Board of Directors' meeting minutes, Dr. Samie's presentation to Pakistan's Aviation Division, the loan documents for the National Bank of Pakistan loan, or any other documents contain relevant information. The Union bases its belief that such documents must contain relevant information almost entirely on news reports following the announcement of the Hotel's closure in October 2020 that allegedly "indicated that the post-closure uses of the Hotel would include conversion to residential/commercial use." Union Br., p. 15. As explained above, not only is this an inaccurate representation of what was reported in the news reports relied upon by the Union, but the news reports themselves demonstrate that such reports were "misleading" and "speculative" and confirm that there are no plans for the Hotel. *See* Union Exs. T-V. This was further underscored by Dr. Samie's testimony about the lack of context and "cut and paste" nature of news reports concerning the Hotel.

Even though the burden to show relevance is placed upon the Union, the evidence also supports a finding that these documents or others do not contain relevant information. In considering the nearly five hours of testimony from the two witnesses, Owner's counsel's representations that the Board meeting minutes contain no relevant information, the time period in which some of the documents were prepared (e.g., the Deloitte Report, as further explained in the Owner's moving brief), and the context of these alleged relevant documents (some of which have not even been proven to exist – such as "Dr. Samie's presentation"), the IC cannot determine that the Union has met its burden of presenting an objective factual basis for believing that these documents or any other documents exist that contain relevant information about the future of the Hotel.

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 45 of 51

The Union's basis for its belief that the loan documents must contain relevant information is even more subjective and speculative. Despite the sworn testimony of the two witnesses that the documents contain no relevant information about the future of the Hotel or ownership, the Union, without any evidence, suggests that the IC must take its word for it that simply because of the nature of the documents-i.e., that they concern a loan-and the Union's belief that it "defies reality" that there are no plans or discussions about the post-closing uses, sale, or transfer of the Hotel, such documents must contain relevant information. Union Br., p. 18. As the Board in *G4S Secure Sols.* held, the mere existence of a document, without any objective evidence in support of a belief that such document contains relevant information, is insufficient to demonstrate relevancy. The *Wagner Hotel* decision, IC Decision 2020-31, does not support a finding that the Union has an absolute right to such documents solely because of the nature of the documents. In *Wagner*, the relevancy of the documents was not at issue. In a clarification order issued on March 31, 2021, the IC made clear that the *Wagner* decision "does not mean that all Hotels bound to the IWA that have a loan or mortgage are now automatically in breach of Article 59 and liable for damages." IC Decision 2021-39. The Union has failed to make any connection or provide any support for finding that simply because documents concerning a loan exist the Union has an absolute right to such documents without the need to demonstrate objective evidence that there is relevant information therein.

**The Union has failed to demonstrate that it is entitled to information concerning a potential sale, transfer, or conversion of the Hotel under the NLRA despite there being no decision made.**

The NLRA does not mandate employers to bargain over a *decision itself* regarding their business and thus does not mandate employers to produce information about the decision or decision-making process. *See Challenge-Cook Bros.*, 282 N.L.R.B. 21, 28 (1986) ("[Since] Respondent has no duty to bargain about the decision [to relocate] itself, it follows that information about that decision need not be produced."); *BC Indus., Inc.*, 307 N.L.R.B. 1275, 1275, n. 2 (1992) (holding that company did not have a statutory obligation to bargain about a partial closure decision, and therefore did not violate the Act by failing to produce documents about the reasons for the closing).

The cases relied on by the Union are distinguishable from the present situation as they deal with circumstances where the employer already made a decision (e.g., to sell, consolidate, transfer, etc.), and the unions were seeking information about the terms of the transaction at issue which might help them bargain over the decision's effects. *See e.g., Delaware Cnty. Mem'l Hosp.*, 366 N.L.R.B. No. 28 (Mar. 7, 2018) (requiring company to produce asset purchase agreement where, upon hearing rumors that the company was being sold, the union asked the company about this and the company confirmed that they had a "definitive agreement" in place to sell);[ Notably, the Union conveniently omits in its brief that *Delaware County Memorial Hospital* was reversed in part by the Third Circuit. *Crozer-Chester Med. Ctr. v. NLRB*, 976 F.3d 276 (3d Cir. 2020). Finding the Board's remedy was punitive in nature and thus inappropriate, the Third Circuit held that the Board should have required only the production of the relevant portions

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY  10036**
**TEL: (212) 541-7212   FAX: (646) 992-8103**

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 46 of 51

of the asset purchase agreement, rather than requiring the additional disclosure of other, irrelevant portions. *Id*] *Beth Abraham Health Servs.*, 332 N.L.R.B. 1234, 1234-35 (2000) (requiring the employer to produce documents regarding the transfer of ownership where there was no dispute about whether a transaction had occurred, but only whether the transaction was a bona fide transfer of ownership, where the relevancy of the information had already been established, and the employer had not presented any other defenses to the union's information requests, such as objecting on the basis that the employer did not have any responsive information in its possession or that the information requests were overly broad or vague); *Supervalu, Inc. v. NLRB*, 184 F.3d 949, 951-52 (8th Cir. 1999) (requiring employer to produce sales agreement where there was no dispute that transaction occurred, relevancy had been established, and the employer itself indicated that the document may contain relevant information); *Providence Hosp.*, 320 N.L.R.B. 790 (1996) (requiring employer to produce documents concerning a consolidation or merger where the employer in letters to the union and employees confirmed that there were discussions about a consolidation and subsequently that the consolidation was approved and moving forward); *Transcript Newspapers*, 286 N.L.R.B. 124 (1987) (requiring employer to produce sales agreement where it was undisputed that a transaction occurred and relevancy was established).

In these cases relied on by the Union, it was undisputed and the decision-maker did not deny that it had actually made a decision, that an actual transaction had already occurred, and that relevancy had been established. Here, the Owner has made no decisions regarding the future of the Hotel, there is no "definitive agreement" or even a contemplated agreement in place, the Owner has explicitly stated that there are no plans regarding the future of the Hotel, and the Union has failed to establish the relevancy of the information requested or its contractual or legal entitlement to such information. Although the Union frames its purported purpose for requesting information concerning a potential sale, transfer, or conversion as necessary "to prepare for impact a/k/a effects bargaining," the Union has failed to explain how it can bargain over the effects of a non-existent decision or why it is entitled to information such as "discussions" regarding these topics despite having no contractual or legal right to bargain over a decision itself.

The Union's reliance on *Las Vegas Sands, Inc.* and its assertion that this decision is "on all fours" with the present case is flawed. As in the other cases above, *Las Vegas Sands* deals with an *actual decision made* by the employer – i.e., the decision to close the hotel. 324 N.L.R.B. 1101 (1997). There was no dispute about whether the employer made a decision, and the employer actually confirmed as much in writing to the unions. *Id.* at 1106. However, the unions were convinced that the closure would not be permanent, and requested documents related both to the decision to close and the permanence of the closure. *Id.* Although the Board held that the employer was required to produce minutes or records of minutes during which certain discussions were had, the basis for the Board's finding was that the union demonstrated objective evidence that it could reasonably have doubted the veracity of the employer's statements as to the permanency of the closure because of the employer's statements at the bargaining table that it had plans to expand and rebuild the facility. *Id.* at 1110. Acknowledging that

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 47 of 51

the unions were not entitled to any documents which "directly concerned the decision" to close since that was "a subject about which [the employer] was under no obligation to bargain…and [was thus] under no statutory obligation to provide the documents," the Board held that the employer was only required to produce certain documents to the extent they included information relevant to the expansion and rebuilding as the union demonstrated an objective basis for the relevance of such information as it related to the nature of the closure, not the decision itself. *Id.*

While *Las Vegas Sands* is not "on all fours" with the present case in the way the Union suggests, it is "on all fours" in demonstrating that the Owner and Employer satisfied their obligations under the NLRA following the *actual decision* to close the Hotel. Notably, the Union's post-hearing brief does not raise any issue with the Owner's and Employer's responses to its information request related to the decision to close the Hotel. Unlike in *Las Vegas Sands*, the Union is not questioning the nature of the closure (or any other decision). Rather, the Union is seeking information "for bargaining for the use of the Hotel post-closing" (Union Ex. N), "investigating the related and affiliated entities who have direct or indirect ownership or control of the Hotel, as well as potential claims under Article 59 and/or 65 of the IWA" (Union Ex. O), and to "investigate whether a claim exists (i.e. potential claim), contractual or otherwise" (Union Ex. S). None of these stated purposes are based on objective evidence or seek information related to an *actual decision* that has been made. Unlike in *Las Vegas Sands*, here, as detailed above, the Union has not demonstrated that the Owner has made any decision producing actual or potential effects over which the Union is entitled to bargain nor any objective basis for its speculative belief that the information it seeks is relevant. Even assuming any documents exist at this time that in any way touch on the subject of the future of the Hotel, logically, such documents could only include discussions and information that "directly concern[]" a potential *future* decision, such as the decision-making process, which *Las Vegas Sands* confirms the Union is not entitled to.

### The Union's Argument That a Penalty Should Be Imposed On The Owner is Baseless and Unfounded

For the reasons above, the Union's argument for imposing penalties on the Owner fails. The Union bases its argument on the assumption that the information it requested is relevant, that the Owner was obligated to produce any documents, and that the Deloitte Report, all Board of Directors' meeting minutes, "Dr. Samie's presentation," and the loan documents were "clearly responsive." As the Union has failed to establish by objective evidence the relevancy of its information requests or its entitlement to information before a decision about a sale, transfer, or conversion is made, the Union has failed to set forth any violation of the IWA, an IC order, or the NLRA justifying the imposition of penalties against the Owner. Notably, the Union's claim that the Owner failed to comply with the orders of the IC is unfounded because the Union again conveniently omits that at the November 5 hearing where this Impartial Chairperson directed the Owner to fully comply with the Subpoenas, he also indicated that "full compliance" could be in the form of advising the Union in writing that there were no plans

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 48 of 51

regarding the future of the Hotel if no such plans existed – which the Owner undisputedly complied with.

### *There Is No Basis For Finding An Adverse Inference Against The Owner*

The Union similarly bases its argument for an adverse inference finding on the assumption that the information it has requested is relevant. For all of the reasons herein, the Union has failed to establish relevancy. As the Union admits in its brief through the cases it relies upon, to find an adverse inference against a party who is alleged to be withholding information, such information must be relevant to the pending disputes between the parties and the alleged withholding party must be shown as doing so without good cause. Again, the cases relied upon by the Union are all distinguishable from the present case. In the cases which the Union relies upon, the relevancy of the information sought by the union was established or not at issue. Contrary to the Union's blatant misrepresentation that the Owner's principals admitted "responsive documents exist," the evidence does not show that the information requested, or the specific documents identified in the Union's brief, is relevant to any issue which the Union has the right to request information for. The Union explains that its requests for information "regarding alternate uses of the Hotel [] bear upon the issue of whether the Hotel's obligations under Article 57 of the IWA has been or will be triggered." Union Br., p. 22. The Union attempts to support its claim that an adverse inference should be drawn because the Owner has not produced documents regarding alternate uses of the Hotel by relying on a false recitation of the underlying facts – that the Owner's October 4 letter referenced Article 57 severance "without the Union even inquiring concerning the same." As stated earlier, this is not so as the Union sent unsolicited Article 57 calculations to Aimbridge on October 1. *See* Owner Ex. 8. Relying on the Union's own analysis, the Union's unsolicited calculation upon receiving notice of the Hotel's permanent closure and its attempt now to baselessly impose Article 57 payments on the Owner as a penalty demonstrates the Union's bad faith motives.

As for the Union's reliance on the *Wagner Hotel* award, the Union has failed to produce any objective evidence in support of its belief that any loan documents here contain relevant information such as that in *Wagner*. As detailed above, the mere existence of such documents does not support a finding that they contain relevant information. Without establishing relevancy or that such documents were withheld without good cause, an adverse inference for non-production of such documents cannot be drawn. Even more, the *Wagner* decision was not issued until March 10, 2021 and thus, has no bearing on the Union's information requests and the Owner's responses to same prior to March 10, 2021.

Even assuming, *arguendo*, that the Union has sufficiently set forth a basis for finding an adverse inference against the Owner, such finding does not alleviate the Union of its burden to prove its case. *Teamsters Local Union 727 v. PAS, LLC*, 2016 WL 4578797, at *30 (2016) (Benn, Arb.) ("[J]ust because an adverse inference is found does not mean that the Union prevails on the ultimate issue. The Union does not automatically 'win'. The Union must still prove its case."). As the Union has failed to demonstrate that it is entitled to information concerning the Owner's decision-making processes,

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY  10036
TEL: (212) 541-7212   FAX: (646) 992-8103

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 49 of 51

that the Owner has violated an order of the IC, or violated the IWA, the Union's Grievance must still be dismissed for failure to prove its case.

**Conclusion**

For all the foregoing reasons, and for the reasons stated in the Owner's moving brief, the Owner respectfully requests that the Union's Grievance be denied in its entirety.

## ANALYSIS

The grievance in this matter, reduced to its essence, is an honest attempt by the Union to obtain information and documents in furtherance of the exercise of its rights under the IWA and the NLRA and to fulfill its obligations to the employees it represents.  In this regard, the Union has demonstrated to my full satisfaction that the Hotel ownership did not act in good faith in response to the Union's legitimate requests for information and documents, as mandated by the IWA and the NLRA.

Beginning over a year ago, the Union issued subpoenas to the Hotel requesting information concerning the current or potential uses of the Hotel after its initial closing in 2020, including whether the Hotel had or was converting to residential use and was in compliance with Article 57 of the IWA. The Union's requests were prompted by multiple news articles that the Hotel was converting to residential use. Yet, notwithstanding my prior Order that the Hotel full comply with the subpoenas, a year later, it still has failed to do so. The Hotel has also ignored my repeated warnings to it that it should fully comply with the Union's multiple requests for information for similar information in order for the Union to ascertain Article 57 compliance as well as for impact bargaining.

Equally deliberate has been the Hotel's refusal to provide the Union with repeated requests for specific information regarding the ownership structure of the Hotel and which could identify the parties with whom the Union could actually bargain regarding the future uses of the Hotel. The Hotel provided no such documents.

Additionally, it was not surprising that the Union requested specific information in connection with a mortgage the Hotel took out in the fall to late 2020 in order to determine whether such transaction was in compliance with or violative of Article 59 of the IWA. Nonetheless, the Hotel blatantly ignored the Union's requests for this information even after the Union repeatedly identified to the Hotel that its failure to provide the same was an issue submitted to the Chairperson to be decided in this case.

Most egregious is the fact that the testimony of the Hotel's ownership representatives proved the existence of documents (consultant report, minutes of Board of Directors, governmental reports and mortgage and loan documents) that were clearly responsive to the Union's Subpoenas and requests for information but were not turned over to the Union. The

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY  10036**
**TEL:  (212) 541-7212   FAX:  (646) 992-8103**

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 50 of 51

Hotel did not offer any reason whatsoever why such documents were not produced and, as such, I am forced to conclude that their reason to do so was intentional.

In light of such finding, the Chairperson must determine that the Hotel ownership's refusal to produce documents responsive to the Union's subpoenas and request for information, which were relevant to impact bargaining and the Union's investigation of the Hotel's related and affiliated entities and violations of Article 57 and 59 of the IWA, violated the IWA and the NLRA. Because I find that such refusal was deliberate and willful, it is not cured by the Hotel's half-hearted offer to produce some of the documents at this late date or somehow have the Chairperson accept bald representations of the content of the same.

The question posed is what shall the remedy be in the face of the Hotel's most egregious conduct?

Federal courts in this jurisdiction have exercised their powers under Rule 37 of the Federal Rules of Civil Procedure to impose sanctions on a party who engages in discovery abuse, including judgment against the recalcitrant party.[2] S.E.C. v. Razmilovic, 738 F.3d 14 (2nd Cir. 2013)(Second Circuit upholds lower court's default judgment in excess of $61 million dollars against a defendant for his refusal to comply with an order to appear and give information at a deposition).

Analogous to this exercise of power, arbitrators have the inherent power to penalize a party's refusal to provide requested information relevant to an issue in a case by drawing an adverse inference against the offending party on such issue. Elkouri and Elkouri, How Arbitration Works (BNA, 5th ed.) at 427-28. The Hotel's ownership repeatedly refused to comply with the Union's Subpoenas and RFIs notwithstanding my prior Order to fully comply with the Subpoenas and warnings to it that the Union was entitled to the requested information.

As such, I must find that the Union has established a prima facie case (most compelling, consultant's report along with multitude of news reports, etc.) that the Hotel was converting the Hotel to residential use. Thus, absent any rebuttal evidence from the Hotel, i.e. Hotel's failure to provide the requested information, I am compelled to draw an adverse inference that the Hotel violated Article 57 of the IWA. Accordingly, I order the Hotel pay each bargaining unit employee the severance provided for in Article 57 of the IWA. The Hotel shall make such payment in the form of a weekly bridge severance payment in the manner permitted under IC Award #2020-75. The Hotel's obligation to make these payments will cease upon the earlier of an award from the Chairperson that the Hotel has established to the Chairperson's satisfaction

---

[2] Rule 37(b)(2) provides that a court may impose the following, among other sanctions, on a disobedient party who ignores a discovery order: directing that designated facts be taken as established for purposes of the action, as the prevailing party claims; prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; and/or rendering a default judgment against the disobedient party.

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (646) 992-8103**

#2021-84
The Roosevelt Hotel New York
November 10, 2021
Page 51 of 51

that it has fully complied with the requests for information and submitted evidence to rebut the adverse inference that it is has or is converting to residential use; or the Hotel re-opens for transient use which would rebut the same.

Additionally, the undisputed evidence in this case established that the Hotel entered into a $142 million dollar mortgage and loan. Absent any rebuttal evidence from the Hotel that such transactions did not include a contingent transfer of the Hotel in the event of default, i.e. Hotel's failure to provide requested mortgage and loan information, I must draw an adverse inference that the Hotel did violate Article 59 of the IWA. However, besides establishing a technical violation of Article 59, as the Union did in the Wagner Hotel, the Union has not yet proven harm. Accordingly, I order the Hotel to fully provide the Union with the requested mortgage and loan information. The Chairperson retains jurisdiction should the Hotel fail to provide such information and/or the Union seeks damages in connection with such violation.

It is ordered.

Dated:      November 10, 2021
            New York, New York

            ELLIOTT SHRIFTMAN, under the penalties of perjury, duly affirms that he is the arbitrator described herein and that he executed the foregoing instrument.

_____
IMPARTIAL CHAIRPERSON